# 22-861(L)

## 22-937(CON)

IN THE

# United States Court of Appeals

### FOR THE SECOND CIRCUIT

◆◆

UNITED STATES OF AMERICA,

*Appellee,*

—against—

JOHN VENDITTO,

*Defendants,*

LINDA MANGANO, EDWARD MANGANO,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

## REPLY BRIEF FOR DEFENDANT-APPELLANT EDWARD MANGANO

FRED A. ROWLEY, JR.
WILSON SONSINI GOODRICH
  & ROSATI, P.C.
633 West Fifth Street, Suite 1550
Los Angeles, California 90071
(323) 210-2900

PAUL N. HAROLD
KELSEY J. CURTIS
WILSON SONSINI GOODRICH
  & ROSATI, P.C.
1700 K Street NW, Fifth Floor
Washington, DC 20006
(202) 973-8800

MORRIS J. FODEMAN
JESSICA R. LONERGAN
ALEXANDER L. LUHRING
WILSON SONSINI GOODRICH
  & ROSATI, P.C.
1301 Avenue of the Americas,
  40th Floor
New York, New York 10019
(212) 999-5800

*Attorneys for Defendant-Appellant Edward Mangano*

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................ iii

INTRODUCTION ................................................................................ 1

ARGUMENT ....................................................................................... 7

I.    The Honest Services Fraud Convictions Should Be Overturned.......... 7

    A.    The Jury Instructions Failed to Convey *Silver II*'s Requirements ...................................................................... 7

    B.    The Evidence of a Promise Was Insufficient............................ 12

    C.    The Honest Services Fraud Counts Are Time-Barred and Should Have Been Dismissed .................................................. 16

    D.    The District Court's Instructions and the Government's Trial Theory Impermissibly Collapse Nassau County and TOB ................................................................................ 21

II.    Mangano's Federal Program Bribery Convictions Must Be Overturned ........................................................................... 42

    A.    Mangano Cannot Be Convicted of Federal Program Bribery as a Principal ............................................................. 42

    B.    Mangano Could Not Be Convicted of Federal Program Bribery under a Theory of Secondary Liability ....................... 48

III.    The Obstruction Conviction Cannot Stand ......................................... 52

    A.    The Jury Instructions Failed to Convey *Aguilar*'s Requirements ...................................................................... 53

    B.    The Evidence of Mangano's Intent Was Insufficient .............. 55

IV.    The Government's Misconduct in Rebuttal Requires Reversal.......... 60

    A.    All Three Factors Weigh in Favor of Reversal......................... 60

    B.    The Government Impermissibly Shifted the Burden of Proof ................................................................................ 65

V.    The District Court Abused Its Discretion in Denying Mangano's Rule 33 Motion ...................................................................... 67

    A.    Singh Perjured Himself at Trial ............................................... 68

    B.    The Perjury Was Highly Material to Mangano's Convictions ...................................................................... 70

VI.   Mangano's Twelve-Year Sentence Was Procedurally and Substantively Unreasonable and the Restitution Order Should Be Reversed ............................................................................... 77

      A.    Mangano's Sentence Was Procedurally Unreasonable ............ 77

      B.    Mangano's Sentence Was Substantively Unreasonable ........... 80

CONCLUSION ..................................................................................... 83

## <u>TABLE OF AUTHORITIES</u>

## CASES

*Bruno v. Rushen*,
   721 F.2d 1193 (9th Cir. 1983) ........................................................................63

*City of St. Louis v. Praprotnik*,
   485 U.S. 112 (1988)....................................................................................11

*Conn. Citizens Def. League, Inc. v. Lamont*,
   6 F.4th 439 (2d Cir. 2021) .............................................................................51

*D.S. ex rel. M.S. v. Trumbull Bd. of Educ.*,
   975 F.3d 152 (2d Cir. 2020) .........................................................................44

*Dupree v. Younger*,
   143 S.Ct. 1382 (2023)...........................................................................10, 17

*E.R. Squibb & Sons, Inc. v. Lloyd's & Cos.*,
   241 F.3d 154 (2d Cir. 2001) .........................................................................10

*Genesis Healthcare Corp. v. Symczyk*,
   569 U.S. 66 (2013)......................................................................................44

*Ginett v. Comput. Task Grp., Inc.*,
   11 F.3d 359 (2d Cir. 1993) ...........................................................................10

*Hawknet, Ltd. v. Overseas Shipping Agencies*,
   590 F.3d 87 (2d Cir. 2009) ...........................................................................11

*Jacques v. DiMarzio, Inc.*,
   386 F.3d 192 (2d Cir. 2004) .........................................................................10

*McCormick v. United States*,
   500 U.S. 257 (1991)...............................................................................14, 15

*McDonnell v. United States*,
   579 U.S. 550 (2016).........................................................4, 5, 9, 13, 22, 23,
                                                                             24, 25, 27, 28, 29, 30

iii

*Percoco v. United States*,
143 S.Ct. 1130 (2023).......................................................1, 5, 6, 7, 9, 23, 32,
33, 34, 35, 36, 39, 45

*Powell v. Alabama*,
287 U.S. 45 (1932)........................................................................63

*Santos v. Murdock*,
243 F.3d 681 (2d Cir. 2001) ........................................................75

*United States v. Aguilar*,
515 U.S. 593 (1995)..........................................52, 53, 55, 57, 59

*United States v. Anderson*,
747 F.3d 51 (2d Cir. 2014) ..........................................................50

*United States v. Arshad*,
239 F.3d 276 (2d Cir. 2001) ..................................................18, 19

*United States v. Awadallah*,
349 F.3d 42 (2d Cir. 2003) ..........................................................56

*United States v. Bautista*,
23 F.3d 726 (2d Cir. 1994) ..........................................................66

*United States v. Biasucci*,
786 F.2d 504 (2d Cir. 1986) ..................................................60, 67

*United States v. Birdsall*,
233 U.S. 223 (1914)................................................................24, 25

*United States v. Brand*,
467 F.3d 179 (2d Cir. 2006) ........................................................53

*United States v. Dantzler*,
771 F.3d 137 (2d Cir. 2014) ..................................................10, 11

*United States v. Dawkins*,
999 F.3d 767 (2d Cir. 2021) ........................................................42

*United States v. Delgado*,
972 F.3d 63 (2d Cir. 2020) ..........................................................49

iv

*United States v. Espinal*,
  981 F.2d 664 (2d Cir. 1992) ........................................................ 60

*United States v. Feldman*,
  647 F.3d 450 (2d Cir. 2011) ........................................................ 80

*United States v. Friedman*,
  909 F.2d 705 (2d Cir. 1990) ...................................... 60, 61, 64, 65

*United States v. Getto*,
  729 F.3d 221 (2d Cir. 2013) .................................................. 77, 78

*United States v. Gonzalez*,
  488 F.2d 833 (2d Cir. 1973) ........................................................ 63

*United States v. Grammatikos*,
  633 F.2d 1013 (2d Cir. 1980) ...................................................... 17

*United States v. Grote*,
  961 F.3d 105 (2d Cir. 2020) ........................................................ 54

*United States v. Halloran*,
  821 F.3d 321 (2d Cir. 2016) .................................................. 36, 37

*United States v. Henry*,
  325 F.3d 93 (2d Cir. 2003) .......................................................... 12

*United States v. Johnson*,
  378 F.3d 230 (2d Cir. 2004) .................................................. 20, 80

*United States v. Kosinski*,
  976 F.3d 135 (2d Cir. 2020) .................................................. 38, 39

*United States v. Lisyansky*,
  806 F.3d 706 (2d Cir. 2015) ........................................................ 50

*United States v. Marrale*,
  695 F.2d 658 (2d Cir. 1982) ........................................................ 63

*United States v. Medina*,
  32 F.3d 40 (2d Cir. 1994) ............................................................ 49

*United States v. Modica*,
    663 F.2d 1173 (2d Cir. 1981) ........................................................67

*United States v. Owen*,
    500 F.3d 83 (2d Cir. 2007) ............................................................76

*United States v. Patel*,
    164 F.3d 620 (2d Cir. 1998) ..........................................................18

*United States v. Percoco*,
    13 F.4th 180 (2d Cir. 2021) ......................................................9, 11

*United States v. Perrone*,
    936 F.2d 1403 (2d Cir. 1991) ........................................................78

*United States v. Quattrone*,
    441 F.3d 153 (2d Cir. 2006) ..........................................................53

*United States v. Rigas*,
    583 F.3d 108 (2d Cir. 2009) ..........................................................80

*United States v. Rivera*,
    971 F.2d 876 (2d Cir. 1992) ..........................................................66

*United States v. Rosemond*,
    841 F.3d 95 (2d Cir. 2016) ............................................................54

*United States v. Schwarz*,
    283 F.3d 76 (2d Cir. 2002) ............................................................57

*United States v. Seijo*,
    514 F.2d 1357 (2d Cir. 1975) ........................................................76

*United States v. Silver*,
    864 F.3d 102 (2d Cir. 2017) ....................................................12, 13

*United States v. Silver*,
    948 F.3d 538 (2d Cir. 2020) ..................................1, 2, 6, 7, 8, 11, 12, 13, 14, 16, 17, 18

*United States v. Singh*,
    877 F.3d 107 (2d Cir. 2017) ..........................................................82

*United States v. Skelos*,
   988 F.3d 645 (2d Cir. 2021) ....................................................8, 9, 11

*United States v. Spruill*,
   808 F.3d 585 (2d Cir. 2015) ............................................................43

*United States v. Thompson*,
   921 F.3d 82 (2d Cir. 2019) .........................................................50, 51

*United States v. Vebeliunas*,
   76 F.3d 1283 (2d Cir. 1996) ...............................................2, 10, 17

*United States v. Walker*,
   289 F. Supp. 3d 560 (S.D.N.Y. 2018) ...............................74, 76, 77

*United States v. Walker*,
   835 F.2d 983 (2d Cir. 1987) .......................................65, 66, 67

*United States v. Wallach*,
   935 F.2d 445 (2d Cir. 1991) .......................... 70, 72, 73, 74, 76, 77

*United States v. Walsh*,
   194 F.3d 37 (2d Cir. 1999) ..........................................................27, 28

*United States v. Zemlyansky*,
   908 F.3d 1 (2d Cir. 2018) ...........................................................49, 50

*United States v. Zhong*,
   26 F.4th 536 (2d Cir. 2022) ............................................................28

*Weeks v. Angelone*,
   528 U.S. 225 (2000).........................................................................16

## STATUTES AND RULES

18 U.S.C. §201(a)(3)...............................................................................23

18 U.S.C. §201(b)(2)...............................................................................23

18 U.S.C. §666(d)(1)...............................................................................45

Fed. R. Crim. P. 30................................................................................54

Fed. R. Evid. 801(d)(1)(A) ..................................................................75

## OTHER AUTHORITIES

ABA Standard 3-5.8(c) ...............................................................................63

Cambridge Dictionary,
    https://dictionary.cambridge.org/us/dictionary/english/crafty ...............62, 63

Nicole Fuller,
    *Mangano Corruption Mistrial: What Went on in the Jury Room*,
    NEWSDAY (Jun. 3, 2018), https://www.newsday.com/long-
    island/nassau/mangano-trial-jury-p69540 ....................................................72

Webster's Third New International Dict.
    528 (1966).........................................................................................62

**INTRODUCTION**

The Answering Brief confirms that the conduct for which the United States tried, and the jury convicted, Defendant Edward Mangano amounts to neither honest services fraud nor federal program bribery. The promises—if any—grounding Mangano's honest services fraud conviction were too open-ended as a matter of law to support a finding that he promised to undertake specific governmental action, as required for a *quid pro quo*. And because Mangano was acquitted of the charged scheme involving the Nassau County office he actually held, the Government now seeks to hold him criminally liable because he purportedly influenced actions taken by a municipality he did not serve, to which he owed no fiduciary duty, and with which he had no agency relationship. The upshot is that Mangano was convicted, at most, for "promis[ing] to keep [someone] happy as the opportunities to do so arose," which falls short of "a promise to exercise particular kinds of influence," *United States v. Silver*, 948 F.3d 538, 570 (2d Cir. 2020) (*Silver II*), and for purportedly "exercis[ing] very strong influence over government decisions," which is insufficient to create a duty of honest services, *Percoco v. United States*, 143 S.Ct. 1130, 1138 (2023). Because this result flowed directly from the district court's instructional errors, and because the Government failed to prove its core honest services and bribery counts even after two trials, this Court should reverse.

The Government's Answering Brief does not seriously dispute that the district

court's jury instructions were at odds with *Silver II*. Nor could it. This Court squarely held that "the official must promise to act *on* an identified 'question, matter, cause, suit, proceeding, or controversy' at the time of the promise." *Silver II*, 948 F.3d at 556. Here, the court's instructions allowed the jury to convict Mangano "for the promise … of official acts by the defendant on an as-needed basis when the opportunity presented itself." A-2371-72-Tr.4517-18. This is exactly the kind of "open-ended" instruction *Silver II* rejected, for it is "limited only by those acts that benefit the payor," without "requir[ing] that a particular *question* or *matter* be identified at the time the official" makes the purported promise. 948 F.3d at 568.

The Government's main rejoinder is to urge waiver, arguing that Mangano failed to challenge the district court's as-opportunities-arise language during the charge conference. GAB94-97. But Mangano had already argued this fundamental point in his unsuccessful motion to dismiss the indictment. The law is clear that if a party has mounted a legal challenge by way of dispositive motions, the party need not reprise its arguments in a futile instructional challenge just to preserve them. *See, e.g., United States v. Vebeliunas*, 76 F.3d 1283, 1292 (2d Cir. 1996). This leaves the Government with only the argument that the court's error in permitting an open-ended promise was harmless. GAB99-100. To meet its burden on that score, the Government insists that its evidence showed Mangano had agreed "to take action and cause others to take action in the future regarding the [Town of Oyster Bay's]

2

indirect guarantee" of loans to restauranteur Harendra Singh. *Id.* at 100. But that argument brings into stark relief another fundamental problem with the Government's honest services and bribery theories: Even though the Town of Oyster Bay ("TOB") loan scheme was the only charged scheme actually found by the jury here, Mangano did not serve TOB, owe a fiduciary duty to TOB, or act as an "agent" of TOB, a completely distinct municipality. Because Mangano was in no position to take "official action," directly or indirectly, on behalf of TOB, Mangano could not be convicted of honest services fraud or bribery for TOB's actions related to Singh's loans.

This fundamental defect stems from the Government's case theory and the jury's acquittals over the two trials, which combined to leave the Government without a scheme to support its conviction against Mangano. As reflected in the court's jury instructions, A-226, the Government charged two different public corruption schemes, which were focused on two different public officials serving two different governments. First, the indictment alleged the "TOB Loan Scheme"—a bribery conspiracy centering on John Venditto, a TOB supervisor. Second, the indictment alleged a bribery conspiracy centered on Mangano as Nassau County Executive. The two schemes comprised distinct acts of alleged bribery and honest services fraud. The gravamen of the first scheme was that TOB supervisor Venditto took bribes in exchange for securing Singh's concession agreements from *TOB*. The gravamen of

3

the second scheme, in contrast, was that Nassau County Executive Mangano took bribes in exchange for securing Singh's food contracts from *Nassau County*.

The incongruity between these charges and the Government's trial theory developed and sharpened after the first trial, when the jury acquitted Venditto and hung as to Mangano. Even though the central player and only TOB official charged in the TOB scheme had been acquitted, the Government merely excised Venditto's name from the superseding indictment and proceeded to trial against Mangano on the *TOB* counts. Because Mangano was acquitted on all the *Nassau County* charges in the second trial, the Government was left with convictions against Mangano on honest services and bribery counts for the wrong government—one Mangano did not serve, and in which he held no official authority.

The jury's incoherent verdict flowed directly from the district court's erroneous instructions, and convicted Mangano for conduct that is not a crime. The court instructed that a defendant may undertake an "official act" by advising or pressuring another without regard to whether the other individual worked for the same government and thus had any "official" duty to heed the defendant's advice or authority. Under that theory, anyone outside the government, including a private citizen with no office, could face criminal public corruption charges for trying to advise or pressure a public official—*viz.*, for engaging in lobbying. That is wholly at odds with *McDonnell v. United States*, 579 U.S. 550 (2016), which limited "official action" to

4

situations in which subordinates and superiors within the same government use their "offices" and chain of authority to leverage corrupt action. Similarly, the district court's instructions suggested that Mangano's *Nassau County* position gave rise to an unbounded fiduciary duty, extending to *TOB and its constituents*. That theory cannot be squared with the Supreme Court's recent admonition that people outside a government cannot be held criminally liable for using informal, non-official means of "dominat[ing] and control[ling]" it. *Percoco*, 143 S.Ct. at 1138-41. If that were so, the honest services and bribery statutes would penalize anyone who "exercise[s] very strong influence over government decisions" even if they lack any fiduciary relationship to that government. *Id.*

If upheld, the Government's effort to save Mangano's conviction by collapsing any distinction between offices and governments would portend sweeping and troubling changes in public corruption law. This is clear from the Answering Brief, which argues that Mangano owed TOB a fiduciary duty because it is "*geographically located within Nassau County.*" GAB122 (emphasis added). Never mind that these are legally distinct governments, with their own interests and structures. Never mind that Mangano's Nassau County position gave him no formal authority or power over the TOB concession decisions at issue. And never mind that the Government's evidence established, at best, that Mangano exercised informal "political clout," and not formal official power, GAB123, to influence the actions of a separate sovereign.

5

As the Government would have it, a public officeholder owes a fiduciary duty to any "government [purportedly] below him," GAB125, and exercises "official action" if he uses advice or pressure to influence action taken by any government anywhere.

That is not the law, and this Court should not adopt that position to cure the district court's instructional errors and the Government's failure of proof. The jury acquitted Mangano of the Nassau County scheme aimed at him. While the Government tried to salvage its failed Venditto prosecution by pressing its TOB theory against Mangano, it offered no evidence to bridge Mangano's Nassau County Office and the TOB actions it alleged were corrupt. The district court collapsed the distinction between the two governments in its instructions, and the Government seized on the resulting confusion by treating Mangano as a *TOB* official in arguing its case. To make matters worse, the district court's instructions allowed the jury to convict Mangano of *open-ended promises* involving TOB. Left to stand, the conviction here suggests that criminal liability could attach if an official exercises "strong influence" over a governmental decision, even if that influence flows from unofficial political clout or being a "well-connected and effective lobbyist," *cf. Percoco*, 143 S.Ct. at 1138, or if an official "accepts a thing of value and then later acts to the benefit of the donor, in any manner," *Silver II*, 948 F.3d at 558. Taken together, these two doctrinal expansions cover much protected lobbying and petitioning activity, including the everyday doings of politicians.

6

This Court should set aside Mangano's honest services and bribery convictions. The United States has had two trials to present its case against Mangano. It simply failed to prove its charges, and the defects in its prosecution cannot be cured without distorting the law in an area where clarity is critical. The convictions should be reversed.

**ARGUMENT**

## I.    The Honest Services Fraud Convictions Should Be Overturned

The record shows that Mangano was convicted of honest services fraud for merely "promis[ing] to keep [someone] happy as the opportunities to do so arose," *Silver II*, 948 F.3d at 570, and purportedly having "very strong influence" on TOB decisions without holding any TOB office, owing TOB any fiduciary duty, or acting as TOB's agent, *Percoco*, 143 S.Ct. at 1138. This result flowed from numerous instructional errors by the district court and fundamental failures of proof by the Government, all of which warrant reversal.

### A.    The Jury Instructions Failed to Convey *Silver II*'s Requirements

The jury instructions failed to convey *Silver II*'s timing and specificity requirements, namely, that "a particular *question* or *matter* must be identified *at the time* the official makes a promise or accepts a payment." 948 F.3d at 558 (emphasis added). The Government does not fully defend the jury instructions, admitting, as did the district court, that "the quid pro quo instructions here do not specifically match what *Silver II* recommends." GAB97; *see also* SPA-99 (acknowledging that

7

the jury "charge did not include the precise language set out in *Silver II*"). In fact, the Government does not rely on the *quid pro quo* instructions at all; instead, it asserts that the instruction for "official act" and the verdict form's reference to the "goal of the conspiracy" conveyed the correct law. *See* GAB98. Neither argument has merit.

It is undisputed that the official act instruction did not convey *Silver II*'s timing requirement. The Government argues only that the official act instruction conveyed *McDonnell*'s "specificity require[ment]." *Id.* Even assuming that is correct, the specificity requirement is insufficient. Nothing in the instructions conveyed the timing requirement, *i.e.*, that a particular question or matter must have been identified *at the time* Mangano made a promise or accepted a payment. Similar "official acts" instructions lacking a timing component were insufficient to avoid instructional error in *Silver II*, *Skelos*, and *Percoco*. *See Silver II*, 948 F.3d at 559 (instruction required finding that defendant "understood that, as a result of the bribe, he was expected to exercise official influence or take official action *for the benefit of the payor* and, at the time the bribe was accepted, intended to do so as specific opportunities arose"); *United States v. Skelos*, 988 F.3d 645, 656 (2d Cir. 2021) ("Although the jury was properly instructed that, for an act to qualify as an 'official act,' it must be taken on a 'question or matter [that is] specific, focused, and concrete,' the jury was not required to find that Skelos and the bribing party shared a specific enough

8

understanding of the question or matter upon payment."); *United States v. Percoco*, 13 F.4th 180, 187, 190 (2d Cir. 2021), *vacated and remanded* 143 S.Ct. 1130 (2023) (similar).

The Government's arguments based on the verdict form fare no better. The verdict form for the conspiracy count (Count 3) directed the jury to specify whether the "goal of the conspiracy charged in Count Three was to commit honest services wire fraud as to the alleged … [TOB] Loan Scheme." A-250. As the Opening Brief explained, AOB38, the verdict form's reference to the "goal of the conspiracy" did not convey *Silver II*'s specificity or timing requirements, and there was no "goal" language for Count 4, the substantive honest services count. The Government offers no response, except to assert that the "objection to the word 'goal' is semantic." GAB98. The Supreme Court held otherwise when it criticized jury instructions defining "official action" to include "acts 'in furtherance of longer-term *goals*'" as "significantly overinclusive." *McDonnell*, 579 U.S. at 577 (emphasis added). Even if the "goal" language somehow conveyed the specificity requirement, the Government concedes that the "goal" language failed to convey *Silver II*'s timing requirement. Thus, even when read "as a whole, combined with the special verdict" form, GAB97, the jury instructions were legally erroneous.

This instructional error was not waived or forfeited. The Government argues that Mangano waived the instructional error because Mangano had included

language similar to the ultimate charge in his proposed jury instructions for the second trial, and that Mangano forfeited the error by not objecting to the court's jury instruction.  *See* GAB94-95.  But in denying Venditto's and Mangano's motion to dismiss, *see* ECF 102 at 30, the district court had squarely rejected the defendants' argument that "the stream-of-benefits theory is no longer viable after (or is at least limited by) *McDonnell*."  SPA-7.  Because the position had been rejected in a pretrial motion, Mangano did not waive or forfeit the error merely by submitting a jury instruction consistent with the court's prior rulings.  While the Government is correct that the district court did not forbid Mangano from "raising an objection," GAB95, there is "no point" in reprising a futile, already-rejected legal argument, *Vebeliunas*, 76 F.3d at 1292, and "no benefit to having a district court reexamine a purely legal issue," *Dupree v. Younger*, 143 S.Ct. 1382, 1389 (2023).[1]  Mangano's motion to dismiss thus preserved the issue for review.

Even if Mangano's motion did not preserve the issue, the specific instructional error challenged here rests on *Silver II*, which was decided post-trial.  Waiver is the "intentional relinquishment or abandonment of a known right, and courts applying

---

[1]    Courts do not require parties to make futile objections.  *See Jacques v. Di-Marzio, Inc.*, 386 F.3d 192, 201 (2d Cir. 2004) (holding that party had not waived jury instruction challenge because his "position on the validity of this disputed jury instruction was explicitly considered and rejected by the district court in its decision denying summary judgment"); *accord E.R. Squibb & Sons, Inc. v. Lloyd's & Cos.*, 241 F.3d 154, 167 (2d Cir. 2001); *Ginett v. Comput. Task Grp., Inc.*, 11 F.3d 359, 361 (2d Cir. 1993).

waiver doctrine have focused on strategic, deliberate decisions that litigants consciously make." *United States v. Dantzler*, 771 F.3d 137, 146 n.5 (2d Cir. 2014). And in preserving arguments, the law "demands conscientiousness, not clairvoyance." *Hawknet, Ltd. v. Overseas Shipping Agencies*, 590 F.3d 87, 92 (2d Cir. 2009) (refusing to apply waiver to argument based on intervening decision); *see also City of St. Louis v. Praprotnik*, 485 U.S. 112, 120 (1988) (holding that party who filed pretrial motion had preserved issue for appeal even though there was no objection to jury instruction, noting that party had "been confronted with a legal landscape whose contours are in a state of evolving definition and uncertainty"). Mangano could not have waived or forfeited an argument based on a decision that had not yet been rendered.

The Government argues that *Silver II* was not "new law or an 'intervening decision.'" GAB96. But *Silver II*'s holding need not have been completely new to excuse Mangano's failure to raise it below; it is sufficient that it clarified the law by applying "*McDonnell*'s narrowing of the definition of official acts" to Circuit precedent on the as-opportunities-arise theory of bribery. *See* 948 F.3d at 567. That *Silver II*'s teachings have exposed instructional errors is powerful evidence that it clarified the law. *See, e.g.*, *Skelos*, 988 F.3d at 656 (finding instructional error under *Silver II*); *Percoco*, 13 F.4th at 190 (same). Even the Government admits that *Silver II* "refined" the law. *See* GAB96.

11

In any event, so long as the instructional error was not waived, this Court may review it for plain error, and it plainly qualifies. The Government argues that any instructional error fails "prongs three or four of the plain-error test," GAB99-100,[2] but there was insufficient evidence to satisfy *Silver II*'s timing and specificity requirements under any standard, *see* AOB39-45.

## B.     The Evidence of a Promise Was Insufficient

The evidence at trial was legally insufficient to sustain a conviction because it failed to establish *Silver II*'s timing and specificity requirements. The Government's newly-adopted retainer argument was neither presented to the jury, nor supported by the record.

### 1.     The Government's as-Opportunities-Arise Theory Lacked Sufficient Evidence

The Government concedes that to convict on an as-opportunities-arise theory, it must show that at the time of an alleged bribe paid to Mangano by Singh, Mangano promised "to take official action on *a specific and focused question or matter*." *Silver II*, 948 F.3d at 568; *see* GAB62-63. In arguing for affirmance, the Government relies only on Linda Mangano's job as the alleged bribe. *See* GAB71-72. Thus, the Government had to prove that at the time that Singh offered to hire Linda, Mangano

---

[2]     Under the modified plain error review standard that the Government concedes applies, "the government, not the defendant, bears the burden to demonstrate that the error ... was harmless." *United States v. Henry*, 325 F.3d 93, 100 (2d Cir. 2003); *see also* AOB39 n.5.

promised to, in exchange, take official action with respect to the TOB loan amend-
ments. There was no such proof, much less proof "clear beyond a reasonable doubt."
*United States v. Silver*, 864 F.3d 102, 120-21 (2d Cir. 2017).

Lacking direct proof, the Government argues first that Mangano was "well
aware" of "Singh's need for the TOB to guarantee his loans." GAB69, 75. But mere
awareness does not establish the required *quid pro quo*. An elected official will
often be aware of constituents' needs, even the particulars. *See McDonnell*, 579 U.S.
at 575 ("[R]epresentative government assumes that public officials will hear from
their constituents and act appropriately on their concerns… ."); *Silver II*, 948 F.3d at
567-68 (noting that "serving constituents … is the everyday business of a legisla-
tor").

Next, the Government argues that a corrupt agreement can be inferred from
"the timeline of events." GAB71. In particular, the Government highlights that
Sinnreich's April 7, 2010 recommendation against the TOB guaranteeing Singh's
loans was followed by Singh "immediately contact[ing]" Mangano, and then Singh
issuing a paycheck to Linda on April 9. *Id.* But the full timeline eviscerates any
inference of an agreement by Mangano to take official action in the TOB matter in
exchange for Singh's hiring Linda. *See* AOB44. In fact, as the Government else-
where concedes, Mangano agreed to help Singh in January 2010, months before
Sinnreich's recommendation and Linda's hiring. *See* GAB15-17.

If credited, the breadth of the Government's desired inference would sweep in broad swaths of legitimate conduct. Indeed, that is why this Court and others have cautioned against drawing an inference of guilt purely from timing. *See Silver II*, 948 F.3d at 558 ("[W]ithout a requirement that an official must promise to influence a particular question or matter, any official who accepts a thing of value and then later acts to the benefit of the donor, in any manner, could be vulnerable to criminal prosecution."); *McCormick v. United States*, 500 U.S. 257, 272 (1991) (holding that extortion could not be inferred from the fact that an official "act[s] for the benefit of constituents … shortly before or after campaign contributions are solicited and received from those beneficiaries").

The Government has no direct evidence of any corrupt agreement or any connection between the TOB matter and Linda's job. Indeed, it is undisputed that Singh—the star cooperating witness—never testified that Mangano promised to act on the TOB amendments in exchange for Singh hiring Linda, nor did Singh ever testify that Mangano requested Linda's hiring in any conversation connected with the TOB amendments.

The Government largely ignores the evidence that undermines its case, such as the evidence that Singh hired Linda with the hope of obtaining a *Nassau County* requirements contract. *See, e.g.*, AOB41. The Government further declines to address statements by Singh, in a recorded conversation and a post-trial civil

14

deposition, that he "didn't get anything" from hiring Linda and that her hiring "had nothing to do with [TOB]."  *See* AOB42-43.

### 2. The Government's Retainer Theory Was Never Presented to the Jury

Lacking confidence in its principal theory of liability, the Government devotes nearly fifteen pages to an irrelevant, alternative "retainer" theory of bribery.  *See* GAB64-67, 80-90.  Under this theory, no particular matter need be identified at the time of the *quid pro quo*; instead, it is "sufficient, without more, to prove the official received payment understanding that the payor would specify a matter in the future." GAB64.  This cannot save the conviction for reasons the Government does not dispute.  Because the jury was never charged on the "retainer" theory, the conviction cannot be affirmed on this basis.  *See* AOB48; A-218-20 (jury instructions); *McCormick*, 500 U.S. at 270 n.8 ("Appellate courts are not permitted to affirm convictions on any theory they please simply because the facts necessary to support the theory were presented to the jury.").  The Government had good reason not to present the retainer theory to the jury—it was impossible to square with the Government's as-opportunities-arise theory that Mangano agreed to act on a particular matter, and it had not been charged in the indictment.  The Government's retainer theory is thus irrelevant.

Regardless, the Government's retainer theory lacks a sufficient basis in the record.  There was no evidence of a retainer agreement.  The Government's account

15

of the record shows, at most, nothing more than that Singh generally expected Mangano to take action for his benefit. *See, e.g.*, GAB80-81. That is precisely what this Court found insufficient in *Silver II*. 948 F.3d at 568. The Government should not be permitted to revive an open-ended as-opportunities-arise theory under a different name.

What is more, the jury's acquittal on the other two alleged schemes—the bread and rolls contract and the OEM emergency food services contract—confirms that the jury rejected the Government's view of the record. The Government suggests that those acquittals were unrelated to the merits of its case because the jury was applying the principle of "no harm, no foul." GAB83-84 n.16. But, of course, the jury was instructed that harm was not required to convict, A-227, and "[a] jury is presumed to follow its instructions," *Weeks v. Angelone*, 528 U.S. 225, 234 (2000). Moreover, the evidence established that in other instances, when Singh explicitly asked Mangano for favors, Mangano declined, much to Singh's resentment. *See* A-1372-Tr.2065 (describing how Neeta Basin could not get contract with County, despite's Singh's attempted intervention); A-1412-Tr.2082-83 (Singh unable to secure requirements contracts). Thus, the Government cannot square its retainer theory with the jury's verdict.

## C. The Honest Services Fraud Counts Are Time-Barred and Should Have Been Dismissed

The Government's flawed as-opportunities-arise theory obscured that the

October 18, 2016 indictment was untimely, as it was filed more than five years after completion of the relevant conduct. *See* AOB45-49. To avoid the time-bar, the Government makes arguments that largely restate the district court's ruling without addressing the arguments from Mangano's opening brief. *See* GAB109-21.

*First*, Mangano's limitations argument was not forfeited. *See* AOB45 n.7. The Government faults Mangano for not requesting a jury instruction on the statute of limitations. *See* GAB109-10. But as the Government concedes, GAB109, the "limitations argument [wa]s premised upon a legal position that [Mangano] had argued unavailingly to the district court in a pretrial motion." *Vebeliunas*, 76 F.3d at 1292 (finding defendant had not "waived the limitations defense by failing to request a jury instruction"). Unlike in the case relied on by the Government to support its forfeiture argument, *United States v. Grammatikos*, 633 F.2d 1013, 1022 (2d Cir. 1980), Mangano raised his limitations argument in a pretrial motion, and the district court's ruling was on the merits. *See* SPA-7-10; *see* ECF 102 at 30. Again, there is "no point" in making a futile, already-rejected legal argument, *Vebeliunas*, 76 F.3d at 1292, and "no benefit to having a district court reexamine a purely legal issue," *Dupree*, 143 S.Ct. at 1389.

*Second*, Linda's paychecks after October 18, 2021, were not backpay. To support this argument, the Government misleadingly cites a string of cases involving deferential review of sentencing determinations. *See* GAB111-12. Those decisions

shed no light on the scope of substantive criminal laws, particularly the provisions here, which courts have given "a narrowing gloss." *Silver II*, 948 F.3d at 558.

In any event, those cases undercut the Government's argument. For example, in *United States v. Arshad*, 239 F.3d 276, 280-82 (2d Cir. 2001), this Court considered three factors to determine whether multiple bribes occurred when applying a Sentencing Guidelines enhancement: (1) whether "the payments were made to influence a 'single action;'" (2) whether the pattern and amount of payments "bear the hallmarks of installment payments, such as a regular schedule of payments over a finite period of time toward a fixed final sum, rather than a series of intermittent and varied bribes;" and (3) whether the "method for making each payment remains the same," such as "the same payor and payee" and being "made in the same form and by the same means."

All three *Arshad* factors indicate Linda's paychecks were not backpay. As relevant here, what the Government alleged was "a single action": Mangano pressuring TOB officials to guarantee Singh's loans, in particular through Mangano's attendance at the April 28 meeting. *See United States v. Patel*, 164 F.3d 620 (2d Cir. 1998) (finding that "the general objective … can also be viewed as a single action"). The paychecks were a regular schedule of payments, not intermittent or varied. And the method, form, and means of payment was always the same—a paycheck from Singh's business to Linda.

18

The Government disputes only two of the *Arshad* factors. The Government argues that Linda's job was for more than a single action because "the no-show job bribe led to multiple loans for multiple locations." GAB111. But those multiple loans were not actions *by Mangano*. Regardless, it is undisputed that "there is no evidence that [Mangano] had any specific involvement" or was "even aware of" the subsequent loans. SPA-137. The Government further argues that Linda's paychecks were ongoing and not "over a finite period of time toward a fixed final sum." GAB112 (quoting *Arshad*, 239 F.3d at 281). But the Government has no evidence connecting Linda's ongoing paychecks to Mangano's earlier actions on the TOB matter. As the district court found, no testimony stated that Linda's continuing pay was "back pay" for Mangano's intervention in the TOB matter. SPA-109. Instead, Singh's testimony was *to the contrary*, namely that he hired Linda to "keep[] the County Executive on call, retainer." A-1249-Tr.1717. Indeed, the Government acknowledges as much in characterizing Linda's paychecks as backpay only "in part." GAB111.

*Third*, Mangano's October 2012 financial disclosure statement (disclosing Linda's job for Singh) was not an act in furtherance of the scheme. The Government argues that the disclosure furthered the scheme by concealing that the job was a bribe and by listing Linda's employer as "Quinn Restaurant Group" to conceal the job's connection to Singh. GAB118. That argument requires, as the district court stated,

19

a finding that Linda's "paychecks in January 2011" were backpay, SPA-119, and so fails for the same reasons as the Government's backpay theory. Alternatively, and separate from the backpay theory, the Government argues that since Mangano had disclosed Linda's job on his 2010 financial disclosure, "he necessarily had to continue doing so for subsequent years as well," making all subsequent disclosure part of the scheme. *See* GAB119 (citing SPA-119). But neither the district court nor the Government explains why Mangano could not have omitted Linda's job from his disclosures.

*Fourth*, the NDH loans were not foreseeable and thus did not extend the limitations period. *See* AOB130-34. The Government argues that the NDH loans were foreseeable to Mangano because he "was a sophisticated lawyer and government official" who knew Singh "had to make multi-million-dollar capital improvements at multiple locations." GAB120. But the mere fact that Mangano was aware Singh "contemplated the possibility" of needing loans for capital improvements does not make the NDH loans reasonably foreseeable. *See United States v. Johnson*, 378 F.3d 230, 239 (2d Cir. 2004). The NDH loans were not foreseeable for a host of reasons the Government fails to address. *See* AOB130-35.

*Fifth and finally*, the Government argues that Count 3's conspiracy charge would be timely because it had not been abandoned or accomplished its objectives by October 2011. *See* GAB121. But this argument depends on an overbroad

20

characterization of the goal of the alleged conspiracy:  obtaining TOB's backing for Singh's multiple loans.  SPA-148.  The evidence at trial did not show beyond a reasonable doubt that the conspiracy's goal was so broad.  Singh's testimony showed a concern about "the [first] loan guarantee," not amendments or loans generally.  *See* A-1157-Tr.1477.  That goal was achieved by June 2010, when the TOB Board authorized the amendments and Venditto executed the two amendments.  *See* A-479.

> ### D.  The District Court's Instructions and the Government's Trial Theory Impermissibly Collapse Nassau County and TOB

On appeal, as in the district court, the Government attempts to collapse any distinction between Nassau County and TOB, treating any action by Mangano, as Nassau County Executive, as though Mangano exercised the governmental power of a separate municipal government.  Its core theory is that "Mangano pressured and exerted influence over Venditto and other TOB officials."  GAB103.  While Mangano undisputedly held no TOB office, and exercised no TOB authority, the Government insists that the jury could properly have convicted him for "taking, or pressuring others to take, *official action* as to the TOB Loan Scheme."  GAB100 (emphasis added).  It is enough, the Government insists, that Mangano wielded "political power," GAB104, and "tremendous political clout," GAB123, and purportedly used that clout to "pressure Venditto" and "have the TOB back Singh's loans," GAB103-104.

This theory assumes that a public official may exercise "official action" in

another government without any evidence that the official held any actual authority, by virtue of his office, within that other government.  It also assumes that a public official may owe a fiduciary duty to a government he does not actually serve, and in which he holds no official power, based solely upon his influence and "political clout," GAB123.  This is a sweeping and novel theory of honest services liability, and it flows directly from jury instructions that glossed over the indisputable fact that Nassau County and TOB are distinct governments, and that holding an office in one does not automatically give an official power in, or a fiduciary duty to, the other.  Throughout its jury instructions, the court ignored this distinction, allowing the jury to find that Mangano undertook an official action and violated a purported fiduciary duty without examining whether he exercised any TOB power in connection with "the TOB Scheme."  GAB100.  The court gave these instructions despite the defense's repeated efforts to hold the Government to its charged schemes and require the jury to make duty and breach findings specific to *TOB*.

These instructions run headlong into the limitations adopted by the Supreme Court in *McDonnell* and more recently in *Percoco*.  In *McDonnell*, the Court made clear that a public official exercises "official action" indirectly, through another official, only if his position confers power over, or responsibility to, the other official in taking that action.  579 U.S. at 577.  It is the official's use of his *office* to force action by *his government* that makes it an "official action."  If the official does not

directly or indirectly take official action on the challenged question or matter, then he is no different, in principle, than any other private party seeking to influence governmental action. On that score, the *Percoco* Court made clear that a party who holds no office within a government cannot be liable for that government's actions unless he was an "actual agent[] of the government" or owed comparable fiduciary duties. *Percoco*, 143 S.Ct. at 1137. Both of these requirements rest on the common-sense principle that a public official may only be held liable for depriving the government *he actually serves* of honest services, and that a person cannot be held liable for actions taken by a government absent proof that he had taken on an agency role and owed it fiduciary duties. The Government's case against Mangano on the TOB scheme cannot be reconciled with these requirements *post hoc*. Nor is that a surprise, for the TOB scheme was charged, structured, and built against a different defendant *within a different government—Venditto within the TOB government*.

### 1. The District Court's "Official Act" Instructions Contravene *McDonnell* and Prejudiced Mangano

To be convicted of honest services fraud, an official must "perform[] [an] official act[]," which "is a decision or action on a specific matter that may be pending or may by law be brought before a public official." *McDonnell*, 579 U.S. at 562; *see also* 18 U.S.C. §201(a)(3), (b)(2). When instructing the jury on "official act," the district court elided the distinction between the Nassau and TOB schemes, and their respective sovereigns. The court instructed the jury that a defendant performs an

23

"official act" by "us[ing] one's official position to provide advice to another, know-
ing or intending that such advice will form the basis for an official act by another."
A-220-21; A-2372-73-Tr.4520-22. But the Supreme Court made clear in *McDon-
nell* that such indirect forms of "official action" are limited to situations where the
defendant advises—or, conversely, "exert[s] pressure on"—another official within
the same government or sovereign. 579 U.S. at 574. The Court explained that "sub-
ordinates" may engage in "official action" where "their superiors 'would necessarily
rely largely upon the reports and advice of subordinates ... who were more directly
acquainted with' the 'facts and circumstances of particular cases.'" *Id.* at 572 (quot-
ing *United States v. Birdsall*, 233 U.S. 223, 234 (1914)). In this situation, the sub-
ordinate necessarily uses his "office" and its "official" relationship to his superior to
influence his superior's actions. *Id.* But this "official action" is lacking when the
defendant advises, or exerts pressure on, another official with no formal official re-
lationship with the defendant and no duty to the same sovereign. In that situation,
the defendant does not use his *office* or *official position* to induce action; his actions
carry no institutional force on the other official, and the other official has no institu-
tional duty to follow or rely upon the defendant. This is true even if the defendant
uses his influence, political clout, charisma, or other unofficial levers to influence
another official.

     This distinction between intra- and inter-sovereign influence is no mere

technicality; it goes to the heart of *McDonnell*'s concern with criminalizing protected lobbying activity and disturbing "[t]he basic compact underlying representative government." *Id.* at 575. For if one public official has no formal or official relationship with another, he essentially acts as a private party in advising or seeking to "pressure" the other official. That sort of general support or influence is a touchstone of the political process. As the Supreme Court explained, our system "*assumes that public officials will hear from constituents and act appropriately on their concerns.*" *Id.*

The Government asserts that "Mangano does not cite a single case suggesting that th[e 'advice'] instruction [wa]s improper." GAB102. But saying that does not make it so. In addition to *McDonnell*, Mangano cited many cases showing that the district court's "advice" instruction was improper in this case. *See* AOB53-55. The Government's choice not to acknowledge those cases, including *Birdsall*—the Supreme Court case on which *McDonnell* relied—does not mean that Mangano did not cite and explain them. And it certainly does not mean that the jury instruction was correct.

Yet despite *McDonnell* and those cases—and over the defense's objection—the district court gave instructions that suggested to the jury that an official's mere advice to, or pressure on, another official amounts to "official action" regardless of whether the other official is a superior or subordinate within the same government.

There is no dispute that Mangano held no office in, and was not employed by, the TOB.  While the Government suggests on appeal that the TOB was a "government below" Mangano's Nassau County office, GAB125, this is pure *ipse dixit*; the Government offered no proof that Mangano's position of Nassau County Executive carried formal authority within TOB, and certainly not on concession amendments or any type of loan guarantees.

Indeed, the testimony is to the contrary.  For example, Genova—a TOB official—testified that TOB has a "$300 million dollar budget" and "offers its residents amenities," like "repair[ing] the roadways," "oversee[ing] … parks and beaches," and "pick[ing] up the garbage."  A-1748-Tr.2942-43.  He testified that TOB pays for those amenities by "assess[ing] taxes."  A-1748-Tr.2943.  More importantly, he testified that decisions for TOB were made either by Venditto or through a resolution passed by the TOB Board and that he "was the only person other than Venditto that could execute documents on behalf of the Town."  A-1749-Tr.2945-46; A-1751-Tr.2955-56; A-1755-Tr.2972; A-1761-Tr.2993; A-1780-Tr.3072-73.  Critically, he avowed that the "Town of Oyster Bay is its own government," that the concessions at issue in the loan amendments were "the Town's property," —"[and that the loan amendments were] purely a town issue."  A-1759-Tr.2987; A-1779-Tr.3066; A-1834-Tr.3159.  Further, the Government stipulated that both "Nassau County, New York" and "Town of Oyster Bay, New York" were "local government[s]" without

any indication that the two were at all related, much less that Nassau County was sovereign over TOB. A-1748-49-Tr.2944-45; GX-1000.

At trial, the defense specifically argued that the "advice" ground set out in *McDonnell* was inapplicable because it "refer[s] to the scenario where a subordinate Government employee advises his or her superior." A-167. Because Mangano was not an employee of TOB or Venditto's subordinate, the defense argued the instruction was "inapplicable to the current fact pattern, and has the potential to seriously confuse the jury." *Id.* Contrary to the defense's argument, the district court instructed the jury that an official's "advice" could amount to official action, without any accompanying language requiring that the officials have a supervisor/subordinate relationship within the same government, inviting the jury to convict Mangano based upon the sort of general support and facilitation that *McDonnell* deemed insufficient for honest services fraud. After all, a person could be deemed to "advise" an official whenever she calls an official and "express[es] support for" an action, and an official could be deemed to "pressure" another official whenever she makes "the myriad decisions to refer a constituent to another official." 579 U.S. at 573-74. But the Supreme Court has held that those actions do not constitute "official action." Because the court's instruction misled the jury on the definition of "official action," it was wrong as a matter of law. *United States v. Walsh*, 194 F.3d 37, 52 (2d Cir. 1999) ("A jury instruction is erroneous if it misleads the jury as to the correct legal

27

standard or does not adequately inform the jury on the law.").

That the jury instruction language "was pulled almost verbatim from *McDonnell*," GAB100-01, is beside the point. What matters is the language from *McDonnell* that the district court *ignored*. *See United States v. Zhong*, 26 F.4th 536, 549 (2d Cir. 2022) (holding that even an instruction quoting a case can be inappropriate if it is legally not pertinent under the facts of the case). It is that language, specifying the context where "superiors 'would necessarily rely largely upon the reports and advice of subordinates,'" *McDonnell*, 579 U.S. at 572, that clarifies that an official's advice to another only constitutes an "official action" in situations in which the officials work for the same government, such that the advice carries official and institutional force.

Because Mangano held no TOB office and had no official relationship to Venditto or the other TOB officials involved in approving the concession amendment, the instruction suggested to the jury that it could convict in a scenario *McDonnell* does not allow: where the Government alleges that someone used their "political clout," GAB105—but no *office*—in advising or pressuring officials in *another* government to take action. This makes all the difference. A telephone call or meeting request from someone with formal authority over, or formal responsibilities to, a fellow public employee carries official force; a call from outside the government does not.

Because the advice language was inapplicable in the first instance, the district court only heightened the risk of confusion by suggesting that "setting up a meeting, speaking with interested parties, consulting with an official organizing an event, or expressing support for an idea" could be "evidence of an agreement to take official action or of using one's official position to exert pressure on or to order another to take official action" or, alternatively, "to provide advice to another." A-2372-73-Tr.4520-22. Taken together, the instruction language allowed the jury to convict someone who lacked formal authority or power within a government, be they a politician in another government or a private person, for engaging in general petitioning activity. Because the "advice" instruction given by the district court was not warranted under the facts of the case and had the potential to confuse the jury and allow it to convict Mangano for acts that did not constitute honest services fraud, the instruction was error. *See* AOB50-61.

There can be no question but that this error was prejudicial. Like the court's instructions, the Government's honest services case against Mangano invited the jury to ignore the line between Nassau County and TOB in weighing Mangano's actions. The Government argued that Mangano performed "official action" related to Singh's concession amendments when he called Venditto and other TOB officials, attended a meeting, and recommended that TOB retain, on TOB's behalf, Mangano's former law firm. GAB103-04. These actions are no different from "[s]etting

29

up a meeting, hosting an event, or calling an official," none of which "qualify as a decision or action" on a given matter under *McDonnell*. 579 U.S. at 571. But the Government insisted to the jury that what set apart Mangano's actions was the "political power" and clout he wielded when he "pressured and exerted influence over TOB officials." GAB106 (quoting A-2144-Tr.3934). Even if Mangano "used his 'political clout' [and] his political pressure" in urging Venditto to support Singh's concession amendments, GAB106, that could not be "*official action*" because Mangano lacked any official authority to act on this TOB matter. With respect to TOB, he was essentially a well-connected private citizen.

The Government compounded the error in summation when it explicitly (and repeatedly) conceded that "the Town of Oyster Bay is a separate government from Nassau County" and reiterated to the jury that TOB and Nassau County were run by "different governments," A-2144-Tr.3934; A-2336-Tr.4418-20, but then affirmatively told the jury that the different governments did not matter. The Government argued to the jury that Mangano could be convicted of honest services fraud because he "could and actually did influence John Venditto and the Town of Oyster Bay to take official action *despite that they ran two different governments*." A-2336-Tr.4420 (emphasis added). The Government doubled down arguing, "[j]ust because Ed Mangano is the Nassau County Executive and not an elected official in the Town of Oyster Bay Government, does not mean that he did not and could not take official

30

action." A-2153-Tr.3971-72. But this was incorrect.

The Government even told the jury that Mangano was wrong to suggest that "there was no official action for the [TOB] loan scheme because Mangano was the Nassau County Executive and not an official with the [TOB]." A-2336-Tr.4418; A-2342-Tr.4442. Instead, the Government told the jury that "[y]es, the Town of Oyster Bay is a different Government" but "[o]f course Mangano had the ability to exert influence or give advice to Venditto," and that the jury needed nothing more to convict Mangano of honest services fraud. A-2336-Tr.4418. The Government expressly told the jury that an "official act" "could include using one's official position, one's political clout to provide advice to another." A-2144-Tr.3936. That erroneous argument to the jury coupled with the district court's misleading "official act" jury instruction—which Mangano objected to multiple times—resulted in substantial prejudice.

### 2. The District Court's Fiduciary Duty Instructions Contravene *Percoco* and Prejudiced Mangano

The Government provides no argument that the jury instructions were adequate. Instead, it argues only that the jury instructions were "nearly identical to that proposed by Mangano" with "the only difference" being "that the district court's charge included the phrase 'and/or the [TOB]'" in the sentence "the goal of the scheme was to deprive Nassau County and/or [TOB] and their citizens of their intangible right to the honest services of" Mangano. GAB126. But, of course, that

difference, albeit small, is exactly what Mangano argues was improper. Indeed, in Mangano's opening brief, he argues that the inclusion of "and/or the [TOB]" "left open the possibility that the jury convicted Mangano without finding that he owed any duty to TOB." AOB66-67.

In other words, the inclusion of "and/or the [TOB]" suggested to the jury that Mangano owed fiduciary duties not just to the Nassau County government he served, but also to TOB—a municipality he did not serve. *See* A-1748-Tr.2942-44. This suggestion was underscored by the court's follow-on directive that "[w]hile Edward Mangano was employed by Nassau County, he owed *the public* a duty of honest services by virtue of his official position." A-227. These instructions permitted the jury to treat Mangano's *Nassau County* office as though it automatically gave rise to a fiduciary duty to *TOB*, and by virtue of this "public position," Mangano owed TOB constituents the same duty of honest services on TOB matters as owed by a TOB official.

That built-in assumption is wholly at odds with *McDonnell* and *Percoco*. The *Percoco* Court made clear that "'[t]he intangible right of honest services' codified in § 1346 plainly does not extend a duty to the public to *all* private persons." 143 S.Ct. at 1138. Rather, the Court explained that a private person must act akin to an "actual agent[] of the government" to be convicted of honest services fraud. *Id.* at 1137. Indeed, the *Percoco* Court held that even instructions requiring that the jury

32

find that a defendant informally "dominated and controlled" the relevant acts were not enough to ensure that the required fiduciary duty existed. *Id.* at 1133, 1138-39.

But here, despite repeated objections from Mangano, the district court refused to give an instruction focusing the jury on the issue of Mangano's actual relationship to TOB. The district court rejected Mangano's requested instruction specifying that the "government must prove that the goal of the scheme was to deprive Nassau County and/or its citizens of their intangible right to the defendant's honest services" and instead added the language suggesting that Mangano owed TOB, not just Nassau County, a fiduciary duty ("*and/or the [TOB]*"), thereby inviting the jury to conflate the two governments. A-181; A-227 (emphasis added).

The Government argues that "[t]he inclusion of the phrase 'and/or the Town of Oyster Bay' is of no moment" on the theory that "the citizens of the Town of Oyster Bay are equally the citizens of Nassau County." GAB126. As the Government would have it, Mangano owed the constituents of TOB a fiduciary duty, even though he held no TOB office, because "TOB is a local government *within* Nassau County," GAB123, which means "[t]he residents of the TOB are residents of Nassau County and, thus, are themselves Mangano's electorate," GAB122-23. But the Government offers no legal support or principle establishing a fiduciary relationship between a public official and distinct municipalities merely because they are "geographically located" within the jurisdiction of the government they serve. It is hardly

33

surprising that this theory lacks any support; were it adopted, it would mean that the President of the United States owes a fiduciary duty not just to the federal government, but to every town, city, and municipality "geographically located within" the United States. That cannot possibly be right, particularly because federal policy is often at odds with local and state governmental policies, creating warring fiduciary duties.

On appeal, the Government argues for the first time that Mangano owed TOB a fiduciary duty because "Nassau County provided certain services to the residents of TOB" such as "police services" and "undoubtedly" spent "its budget on things related to the TOB." GAB123. But that is both factually and legally irrelevant. It is factually irrelevant because the Government introduced no evidence on this score. Instead, it offered evidence that TOB was "its own government" with "16 different departments" and a "$300 million dollar budget." A-1748-Tr.2942; A-1779-Tr.3066. It is legally irrelevant because, as *Percoco* explained, the question is whether someone who is "not formally employed by a government entity" has nonetheless "enter[ed] into agreements that make them actual agents of the government." 143 S.Ct. at 1137.

Here, there was no serious dispute that Mangano was not a TOB agent. Indeed, the Government did not offer any theory at trial for that type of formal agency relationship between TOB and Mangano, and conceded after trial that "Mangano is

34

correct that he was not an agent of the TOB." Dkt. 485 at 35. Similarly, in its bribery instructions, the district court recognized that "[e]lected officials are agents *of the government to which they were elected to serve*," A-216 (emphasis added), and specified that "it is not alleged that Edward Mangano is an agent of the Town of Oyster Bay," *id.* Without the requisite formal tie, any general relationship between Nassau County and TOB is not enough. If general relationships among state and local governments were enough to create fiduciary duties to "government[s] to which they were [not] elected," *id.*, local officials would find themselves with multiple and often conflicting duties. For while state and local governments often have cooperative agreements, they also have conflicting policies, plans, and objectives.

Additionally, the Government's assertion that Mangano "was [n]ever registered as a lobbyist" misconstrues Mangano's argument. GAB124. Mangano's argument is not that he *was* a lobbyist by trade but that his actions with respect to the TOB loans were akin to that of a lobbyist. Put another way, because Mangano had absolutely no power over the TOB loans, any actions related to the TOB loans were the type of informal lobbying that elected officials engage in every day. As explained in Mangano's opening brief, allowing honest services fraud to sweep so broadly that it could cover such conduct would raise serious First Amendment and federalism concerns, AOB80-82, not to mention issues of vagueness, *see Percoco*, 143 S.Ct. at 1138; *see also id.* at 1139-40 (Gorsuch, J., concurring) ("[N]o one knows

35

what 'honest-services fraud' encompasses. And the Constitution's promise of due process does not tolerate that kind of uncertainty in our laws—especially when criminal sanctions loom. 'Vague laws' … 'leave people with no sure way to know what consequences will attach to their conduct.'").

Here, the court's instructions invited the jury to convict Mangano for violating fiduciary duties to TOB despite the complete lack of any evidence to support such duties. *Percoco* forecloses the Government's argument that Mangano had a fiduciary duty to TOB because he "had tremendous political clout," GAB123, and none of the evidence supports any formal relationship between TOB and Mangano.

### 3. The Conduct for which Mangano Was Convicted Is Not Honest Services Fraud as a Matter of Law

Because the Government failed to offer evidence establishing that Mangano either owed a fiduciary duty to TOB or took any official TOB action in connection with the TOB matter, the conviction against Mangano cannot stand.

The Government contends that Mangano owed a fiduciary duty to the TOB with regards to the TOB loans because of the TOB's "geographic[] locat[ion]" and because of his "tremendous political clout," his party "position[,] and [his] political affiliation." GAB122-23. But the former reason is irrelevant to fiduciary duty, and the latter are the exact facts that this Court and the Supreme Court have held insufficient to establish a fiduciary duty on which honest services fraud can be based.

When assessing honest services fraud, under New York and federal law, "a

fiduciary relationship arises between two persons when one of them is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation." *United States v. Halloran*, 821 F.3d 321, 338 (2d Cir. 2016). In other words, the question here is whether Mangano had a legal duty to "act" on or "give advice about" the TOB loans; where the TOB is located does not matter. Tellingly, the Government does not argue that Mangano had any duty with regards to the TOB loans. There was no evidence or argument at trial that Mangano was elected to a TOB office, worked as a TOB employee, or wielded power as a TOB official. The Government concedes that Mangano held no official position with the TOB and thus had no legal authority to "act for" the TOB on the TOB loans.

Instead, the Government argues that Mangano had a fiduciary duty sufficient to undergird an honest services fraud conviction due to his "influence," "clout," and "political affiliation." GAB123. Throughout the trial, the Government argued that Mangano could be found guilty because of his "political clout," A-2144-Tr.3936, A-2154-Tr.3974, and because he had "influence over government officials in" the TOB, A-2141-Tr.3924. Its theory was consistently that Mangano used his "political clout, his political pressure," as "the highest elected official in Nassau County Government," to "get John Venditto and Len Genova and the Town of Oyster Bay to

37

Guarantee these loans." A-2154-Tr.3974.[3] The Government continues that refrain

before this Court, arguing that Mangano "use[d] his position as the highest elected

official in Nassau County, highest-ranking member of the Republic Party and new

political power to pressure Venditto to back his loans," GAB104, and "used his po-

sition as the highest elected official in Nassau County to pressure officials,"

GAB125. Because the Government cannot point to any formal power that Mangano

had over the TOB's decisions about the loans, it again emphasizes that Mangano had

"tremendous political clout," GAB10; *see also* GAB171, 184, and had the "ability

to exert influence," GAB171, *see also* GAB77, 81, 107, 185, 197. The Government

also focuses on Mangano's position as a leader in his political party to argue that he

had a fiduciary duty. But neither this Court nor the Supreme Court allow those fac-

tors to support a fiduciary duty for honest services fraud.

In *United States v. Kosinski*, 976 F.3d 135 (2d Cir. 2020), this Court noted

that "it is essential to avoid the Scylla of a rule which permits a finding of fiduciary

duty on the basis of mere influence." 976 F.3d at 150. Such a rule would "threaten

---

[3]     *See also* excerpts from the Government's summation: A-2336-Tr.4420 (point-
ing to Mangano's "ability to influence and advise [TOB] officials"); A-2335-36-
Tr.4416-17, A-2158-Tr.3992-93, A-2336-Tr.4420, A-2341-Tr.4437-38 (same); A-
2335-Tr.4415 (emphasizing Mangano was "the highest ranking member of the same
Republican party"); A-2336-Tr.4417-19 (same); A-2342-Tr.4441 (focusing on
"Mangano using his political clout"); A-2153-Tr.3972, A-2158-Tr.3992-93, A-
2327-Tr.4382, A-2335-Tr.4416, A-2341-Tr.4437-38 (same).

38

to criminalize a wide range of conduct, from lobbying to political party activities."
*Id.* Just this term in *Percoco v. United States*, 143 S.Ct. 1130 (2023), the Supreme
Court explained that a fiduciary duty for honest services fraud cannot be premised
on a "persons' clout exceed[ing] some ill-defined threshold" or the power instilled
in "political party officials." 143 S.Ct. at 1138. There, the Court rejected jury in-
structions predicating an honest services conviction on whether the defendant "dom-
inated and controlled any governmental business" or whether "'people working in
the government actually relied on him because of a special relationship he had with
the government.'" *Id.* at 1138-39. "From time immemorial," the Court explained,
"there have been *eminence grises*, individuals who lacked any formal governmental
position but nevertheless exercised strong influence over government decisions." *Id.*
at 1138.

*Percoco* makes clear that proof that a person "dominated" the government on
a matter, without more, is too vague to support an honest services conviction. Yet,
that is essentially the proof the Government attempted to offer here. It offered evi-
dence that Mangano had "strong influence" by virtue of a political office outside the
TOB government. Like *Percoco*, Mangano "lacked any formal governmental posi-
tion," *id.*, and any power he had in TOB did not flow from any government office.
Even though Mangano plainly owed Nassau County and its constituents' fiduciary
duties and a duty of honest services on Nassau County matters, he did not owe TOB

or its constituents fiduciary duties by virtue of an office outside that government and the "political clout" that flowed from it.

The Government's emphasis that "Singh testified [that] he only began to bribe Mangano" because he was "elected as Nassau County Executive" hurts rather than helps its argument. Elsewhere in its brief, the Government clarifies that Singh allegedly bribed Mangano because "Mangano had a tremendous influence," "he had influence in" the TOB, he was a "Republican leader," and "[h]e was a personal friend of John Venditto." GAB53-54. Those are exactly the reasons this Court and the Supreme Court have said do not support a finding of fiduciary duty for honest services fraud. Because the Government has not (and could not) point to anything other than "political clout," "influence," and party position when discussing "the relationship between the two governments," Nassau County and the TOB, it has failed to show any relevant fiduciary relationship between Mangano and the TOB.

For similar reasons, the record evidence is inadequate to establish that Mangano undertook "official action" in connection with the TOB loans. As discussed above, there was no evidence at trial that Mangano was a TOB official, or that his Nassau County office carried any formal authority or power within the TOB government. As the Answering Brief makes clear, the Government's theory at trial was that Mangano used the power and prestige from his Nassau County office not to directly take action on Singh's loans, but to influence TOB officials, who themselves

40

took "official action" on Singh's loans. *See, e.g.*, GAB103-08. In its opening brief, the Government debuted the theory that "Mangano used his influence with John Venditto to persuade [Venditto] to assist [Singh]." A-618-Tr.43. And it carried that theory through the whole trial. And in summation, the Government argued that an "official act" "could include using one's official position, one's political clout to provide advice to another, knowing or intending that such advice could form the basis of an official act *by another*." A-2144-Tr.3936 (emphasis added). It explicitly told the jury that "Mangano can be held responsible for the official actions taken by John Venditto," A-2153-Tr.3972, and that "Mangano can and should be held responsible for the official actions taken by John Venditto and Len Genova," A-2342-Tr.4442. *See also* A-2154-Tr.3974; A-2336-37-Tr.4420-21; A-2341-Tr.4437-38.

As noted, Mangano could not have advised or pressured Venditto, as contemplated by *McDonnell*, because he had no formal or employment relationship with the TOB. The Government offered no proof that Mangano could have, or did, exercise any of his Nassau County authority in a manner that carried formal force within the TOB, let alone formally influence the TOB's decision to approve Singh's concession amendments. And while the Government now suggests that the TOB was a "government below" Nassau County, GAB125, it offered no proof at trial that Mangano's office had any official authority over how the TOB administered its concessions permits and agreements. Indeed, it stipulated that both were "a local

41

government" without any mention of interaction between the two.  A-1748-49-Tr.2944-45; GX-1000.

## II.    Mangano's Federal Program Bribery Convictions Must Be Overturned

### A.    Mangano Cannot Be Convicted of Federal Program Bribery as a Principal

Section 666 states that "an agent of a[] … local … government" who accepts bribes "intending to be influenced or rewarded in connection with any business … of such … government" is guilty of federal program bribery.  The superseding indictment made clear that the "TOB Loan Scheme" involved only "the TOB's guarantee of certain loans that certain business entities of Singh's received … in connection with Singh's status as a TOB concessionaire."  A-149.  The superseding indictment further reiterated that "the TOB Loan Scheme" involved "a concession agreement with the TOB" about "property owned by the TOB," that "the TOB indirectly guaranteed the loans," and thus that "the TOB agreed to repay" if Singh defaulted.  A-149-50.  In short, the superseding indictment makes clear that the alleged TOB scheme involved only "business" of the TOB.  Because Mangano was only convicted in connection with that scheme, for principal liability he must have been an agent of the TOB.  *See United States v. Dawkins*, 999 F.3d 767, 787 (2d Cir. 2021).

But at trial, the Government consistently argued that it could convict Mangano *as a principal* even if he was not an agent of the TOB.  A-2301-Tr.4277; A-2326-Tr.4377-78.  The district court rightly rejected that argument, concluding that if

42

Mangano was not an agent of TOB, he could not be guilty of the TOB matter as a principal. A-2326-Tr.4377-78. The Government now tries to do an about-face and argue that Mangano *was* an agent of TOB. GAB184-87. That argument is untenable. *First*, the Government has already repeatedly conceded that Mangano was not an agent of TOB. *Second*, the law is clear that Mangano was not an agent of TOB.

### 1. The Government Repeatedly Conceded that Mangano Was Not an Agent of TOB

Before the first trial, the Government tried to argue that "Mangano acted as an agent and fiduciary of the TOB." Dkt. 90 at 34-35. The district court declined to rule before trial, SPA-6, and the Government chose not to raise it again. For example, the Government declined to mention fiduciary duty in the superseding indictment, A-155; at argument on Mangano's renewed motion to dismiss before the second trial, Dkt. 318; or during any of its briefing, argument, or presentation to the court or jury in the second trial. Because the Government abandoned its fiduciary duty argument below, it cannot resurrect it now. *United States v. Spruill*, 808 F.3d 585, 596-97 (2d Cir. 2015) (holding that a party waives an argument "that it previously raised and abandoned below" or that it made a "tactical decision" not to rely on below).

And at the second trial, the Government expressly and repeatedly argued that Mangano was *not* an agent of TOB. *See, e.g.*, Dkt. 485 at 35 (Government conceding during post-trial briefing that "Mangano is correct that he was not an agent of the

43

TOB"); A-2326-Tr.4377 (Government stating during second trial that it was not ar-guing that Ed Mangano is the agent" of TOB); A-2105-Tr.3909 (Government agree-ing during charge conference that it was "not alleged that Edward Mangano [was] an agent of the [TOB] because it's not in the indictment" and that "[t]here's no the-ory under which the jury should be allowed to convict under the notion that Edward Mangano is an agent of the Town of Oyster Bay").

When a party "concede[s]" a point before a lower court, it "waive[s] … the issue" and thus cannot raise an argument contrary to the concession to the appellate court. *Genesis Healthcare Corp. v. Symczyk*, 569 U.S. 66, 72-73 (2013). Indeed, when a party "ma[kes] a … concession" to the court below, the proper course is for the appellate court to "assume, without deciding" that the concession is correct. *Id.* "When a party makes a concession" about either "law or fact," this Court "typically accept[s] or assume[s] the accuracy of the concession without question. This prac-tice permits the parties to frame the litigation." *D.S. ex rel. M.S. v. Trumbull Bd. of Educ.*, 975 F.3d 152, 162 (2d Cir. 2020). Because the Government clearly conceded that Mangano was not an agent of the TOB, it cannot at this stage reverse course and argue that he is.

### 2.    Mangano Is Not an Agent of TOB

Although the Government conceded that Mangano was not an agent of the TOB below, it now argues that the definition of "agent" is "expansive" and

"broad[]," and thus Mangano is an "agent of … all subdivisions and governments within [Nassau] County," including the TOB. GAB183-85. The Government is wrong.

As the Government states, the term "agent" is defined as "a person authorized to act on behalf of another … includ[ing] a[n] … employee, and a partner, director, officer, manager, and representative." 18 U.S.C. §666(d)(1). But, as discussed above, Mangano did not have "authori[ty] to act on behalf of" the TOB nor was he an "employee" or "representative" of the TOB. Nor did he become an "actual agent[] of the government" by "enter[ing] into [an] agreement." *Percoco*, 143 S.Ct. at 1137. Thus, under the federal program bribery statute, Mangano was not an agent of the TOB at all, and certainly not with respect to the TOB loan amendments. 18 U.S.C. §666(d)(1). Indeed, when discussing the loan amendments, witnesses testified that Mangano had no role in "purely a town issue," A-1672-73-Tr.2749-53; A-1759-Tr.2987, and the Government stated in its Answering Brief that the TOB meeting about the loans involved "no Nassau County business," GAB23.

The superseding indictment likewise bolsters the fact that Mangano had no authority to "act on behalf" of the TOB in relation to the loans relevant here.[4] The

---

[4] The Answering Brief lists several services that Nassau County provided to the TOB, such as emergency and police services. GAB185 n.28. Putting aside the complete lack of evidentiary support, those services are wholly unrelated to the

indictment states that "[t]he Town Board was the legislative authority for the TOB," which "awarded contracts to provide services." A-147-48. It continues that the "Supervisor, the highest-ranking elected official in the TOB, acted as both the chief executive and fiscal officer of the Town. The Supervisor was a member of the TOB Town Board, which was the legislative authority for the TOB, presided over Town Board meetings, and voted on matters before the Town Board." A-148. The superseding indictment also highlighted that "the [TOB] Supervisor and other TOB officials," not Mangano, had to "execute the amendment[s] to the concession agreement[s]" that "served as indirect guarantees for loans given to Singh." A-150; *see also* A-154. Thus, the allegations in the indictment make clear that Mangano had no authority to "act on behalf" of the TOB.

And, as discussed further above, the testimony at trial supports that proposition. Genova testified that he "was the only person other than Venditto that could execute documents on behalf of the" TOB, which included the loan agreements and amendments. A-1761-Tr.2993. He explained that the TOB has "its own government," which includes a town board and a supervisor. A-1779-Tr.3066-67. He agreed that the town board had to "vote on town resolutions" and "pass[] resolutions," including the loan amendments and other "contracts and agreements." A-

---

concession loans and thus irrelevant to whether Mangano was an "agent" of the TOB for purposes relevant to this case.

1779-Tr.3067. He testified that "[t]he contracts and agreements [we]re typically executed after the resolution passed" by the supervisor. A-1779-Tr.3067-68. No evidence contradicts Genova's testimony. Nor does the Government point to any evidence showing that Mangano had the power to act on behalf of the TOB.

In a last-ditch effort to save its flawed theory, the Government argues by hiring people that Venditto recommended, "Mangano accepted bribes from Singh [to further the TOB matter] 'intending to be influenced … in connection with' Nassau County business." GAB184 (alteration in original). But the Government never charged Mangano with being bribed to hire or promote certain people. Nor was the jury ever presented with a Nassau County hiring or promotion scheme. And even assuming that Mangano accepted a bribe from Singh to lobby the TOB to pass the loan amendments, the idea that in doing so he "intended to be influenced" in who he hired in Nassau County—well before Venditto even approached him about hiring certain people—defies logic. It is a clear attempt, post hoc, by the Government to shoehorn its square principal-liability theory into the law's round hole. Similarly, the Government's assertion that "Singh's reasonable belief that Mangano could act on behalf of … [the] TOB" means that it does not matter "whether Mangano was charged as a Nassau County or TOB agent" strains credulity. GAB187. The elements of federal program bribery require that the Government charge and prove, beyond a reasonable doubt, that Mangano, "being an agent" of the relevant

47

government, took a bribe "intending to be influenced" in *that government*. Singh's reasonable belief has no bearing.

Although the law forbids Mangano from being convicted as a principal, the Government argued to the jury that Mangano *could* be guilty for the TOB scheme as a principal. *See* A-2173-Tr.4052-53 ("Mangano is guilty [of Count 2] under any theory of liability, … most predominantly as a principal" and spent only one page of its 236-page summation addressing aiding and abetting and coconspirator liability.). That was error; but the district court refused to instruct the jury that Mangano could not be found guilty for the TOB scheme as a principal. A-2365-Tr.4492-93. Because the Government's erroneous theory of principal liability infected the trial and the district court failed to cure that error, this Court should overturn Mangano's bribery convictions.

### B. Mangano Could Not Be Convicted of Federal Program Bribery under a Theory of Secondary Liability

#### 1. The Evidence of Aiding and Abetting Was Insufficient

In his opening brief, Mangano argued that "nothing in the record supports the conclusion that Mangano aided and abetted the crime charged in the indictment." GAB79. Mangano agrees with the Government that the indictment "provide[d] notice of the charge against which [Mangano had to] defend." GAB189-90. But the Government is wrong about what crime the superseding indictment charged when "it tracked the language of Section 666." GAB190. That charge did not include a

conspiracy to bribe Venditto for Venditto's benefit. The superseding indictment, though "largely" similar to the original indictment, GAB192, differed in important ways. For instance, it charged Mangano with federal program bribery and the related theories of secondary liability only for bribes allegedly paid to him. A-153-55 ("demand[ing] for the *benefit of EDWARD MANGANO*") (emphasis added). True, the indictment "continue[d] to allege that [Mangano] was a member of a bribery conspiracy with Singh and TOB officials." GAB192. But the substantive crime and the bribery conspiracy charged only involved bribes to Mangano, *i.e.*, *for Mangano's benefit*.

To be convicted under an aiding-and-abetting theory, the defendant must have "consciously assisted the commission *of the specific crime* in some active way." *United States v. Medina*, 32 F.3d 40, 45 (2d Cir. 1994) (emphasis added). "The specific crime" does not mean the same *type* of crime as the one charged in the indictment; it means the actual crime charged in the indictment. *United States v. Delgado*, 972 F.3d 63, 75 (2d Cir. 2020). Indeed, "federal accomplice liability is not so capacious as to encompass any act taken in relation to *some identified criminal activity*" but "must contribute to the success of 'the specific underlying crime' for which the defendant is charged with aiding and abetting," even if there is "evidence that he aided and abetted a second, separate crime, … related to the first." *Id.* (emphasis added). Conspiracy requires "the specific intent that the object of the

49

conspiracy be committed," *United States v. Zemlyansky*, 908 F.3d 1, 10 (2d Cir. 2018), and the "conspiracy" must be "the scheme alleged in the indictment," *United States v. Anderson*, 747 F.3d 51, 60 (2d Cir. 2014).

Mangano clearly described this argument as a sufficiency argument in his opening brief. Instead of responding to that argument, the Government attacks a strawman and fails to address (or even acknowledge) any of the nine cases Mangano cited. *See* AOB76-84. Importantly, *none* of the cases that Mangano cited in support of his argument involved constructive amendment. Instead, *all* of the cases analyzed sufficiency of the evidence when assessing secondary liability, and the admonition that the evidence must be sufficient to convict the defendant of aiding and abetting *the crime charged in the indictment*, not a related crime. But the Government does not address that argument at all.

In short, the Government argues against something that Mangano did not and does not assert (that the indictment was constructively amended). And it utterly fails to rebut Mangano's actual argument—that the evidence was insufficient to prove that Mangano aided and abetted the *crime charged in the indictment*. The problem is not that the evidence and jury instructions "so modif[ied] essential elements of the offense charged." GAB190 (quoting *United States v. Lisyansky*, 806 F.3d 706, 712 (2d Cir. 2015)). The problem is that the Government failed to prove the elements of the actual charges in the operative indictment. Because the Government "did not

contest" Mangano's argument (or the cases he cited), "it [has] waived any such argument," and the Court should reverse. *United States v. Thompson*, 921 F.3d 82, 85 n.4 (2d Cir. 2019); *see also Conn. Citizens Def. League, Inc. v. Lamont*, 6 F.4th 439, 444 (2d Cir. 2021).

### 2. The Prosecution Failed to Prove Mangano Knew Singh Was Bribing Venditto

But even if the Government could have proven the crimes alleged in the indictment by showing that a TOB official accepted bribes and that Mangano aided and abetted or conspired to complete that offense, the evidence was still insufficient. The Government points to only two pieces of "evidence": (1) Mangano hired certain Republicans at Venditto's request shortly after the meeting about Singh's TOB loans, GAB188; and (2) Mangano allegedly knew that Singh had a "long history of doing business in the TOB" and was "willing[] to bribe Mangano," *id.* Neither of those points, even if true and shown at trial, were sufficient to prove that Mangano knew that Singh was bribing TOB officials in relation to the TOB loans.

*First*, the favor that Venditto requested of Mangano—that he hire certain people—had nothing to do with Singh and in no way benefitted Singh. Thus, even assuming Mangano thought that Venditto asked that favor in exchange for passing the TOB loan amendments, there is no evidence that Mangano would have believed that Venditto's request was a product of Singh bribing Venditto. In fact, the opposite is true. If Venditto had passed the amendments without asking a favor from Mangano,

that would be stronger evidence that Singh was bribing Venditto. Why would Venditto ask Mangano for a favor to do what Singh was already paying him to do? Nothing about Venditto's run-of-the-mill request would have put Mangano on notice that Singh was also bribing Venditto and other TOB officials.

*Second*, the Government argues against itself. Though it now tries to say that Mangano knew Singh was bribing Venditto, in summation, it expressly argued that Mangano would not have known that Singh was bribing any other officials, including the TOB officials. The Government stressed that even if Singh had been bribing the TOB officials, he would not have "told … anyone else that he was bribing … Venditto or Genova" because "Singh was a savvy criminal" and "hid his criminality from people." A-2346-Tr.4457-59. Mangano noted this in his opening brief, AOB80-81 & n.12, but the Government failed to explain how it can now assert that Mangano knew what it previously argued he would not know. The bribery convictions cannot stand based on a theory that Mangano "knew" that Singh was also bribing TOB officials.

## III. The Obstruction Conviction Cannot Stand

Mangano's conviction for conspiracy to obstruct justice cannot stand because the jury was not properly instructed about the nexus requirement established by *United States v. Aguilar*, 515 U.S. 593 (1995), and because the evidence was legally insufficient to establish Mangano's intent.

52

## A.      The Jury Instructions Failed to Convey *Aguilar*'s Requirements

The district court failed to properly instruct the jury that "merely uttering false statements to an investigating agent who may or may not testify before the grand jury is not sufficient to satisfy" the intent element of the obstruction of justice charges, as Mangano requested in his proposed jury instructions.  *See* A-72; A-191. Two key points—undisputed by the Government—require reversal.

*First*, the Government does not dispute the governing legal standard or its application here.  *See* AOB93-94.  A trial court errs in failing to give an instruction requested by the defendant if the "instruction is legally correct, represents a theory of defense with basis in the record that would lead to acquittal, and the theory is not effectively presented elsewhere in the charge."  *United States v. Quattrone*, 441 F.3d 153, 177 (2d Cir. 2006); *accord United States v. Brand*, 467 F.3d 179, 205 (2d Cir. 2006).  Mangano's requested instruction was a correct statement of the law, quoting from and capturing the core "statutory line" drawn by the Supreme Court in *Aguilar*. 515 U.S. at 601.  It was grounded in the record, which undisputedly showed that Linda's statements—the alleged obstructive acts—were made to FBI agents and prosecutors during interviews, not to the grand jury.  And nothing else in the charge conveyed this defense theory.  The district court flatly erred in failing to give Mangano's requested instruction.

*Second*, the Government's principal response—that Mangano forfeited the

instructional error by not objecting during the charge conference, GAB129-30—is refuted by the record, *see* AOB93-94 n.14. The Government concedes that Mangano specifically objected to the omission of the requested language at the first trial. *See* A-72 (requesting the instruction and citing *Aguilar*); *see also* AOB90. The district court did not adopt the requested language then. Nor does the Government dispute that raising the objection again would have been futile. Federal Rule of Criminal Procedure 30, cited by the Government, does not require parties to lodge "futile" objections. *See United States v. Grote*, 961 F.3d 105, 115 (2d Cir. 2020) (explaining that where the defendant "previously objected, making its position clear," and "re-newal of the objection would be futile because the court had clearly manifested its intention to reject the objection, the failure to renew the objection as specified in Rule 30(d) does not forfeit *de novo* review"). Given that Mangano's specific objection had been previously raised and rejected, it was futile and unnecessary to specif-ically raise it again at the second trial. *See United States v. Rosemond*, 841 F.3d 95, 107 (2d Cir. 2016) (finding no waiver from failing to object at second trial because re-raising objections from first trial "would have been futile").

Even apart from these undisputed points, the Government's theory is funda-mentally unsound. The Government asserts that the jury instruction was a correct statement of the law because it repeatedly referenced "*a federal grand jury investi-gation*" and required the jury to find that the defendants "intended to obstruct … *a*

*federal grand jury investigation.*" GAB130-31.  But that instruction failed to convey "the statutory line" between delivering false testimony "to an investigating agent" rather than "to the grand jury itself." *Aguilar*, 515 U.S. at 601.  In other words, the jury instruction failed to make clear that a false statement to an investigating agent alone was insufficient to obstruct a federal grand jury investigation.  The Government's strategy at trial was to blur that line, as it argued in both its opening and summation that the Manganos intended to lie "to federal agents" as if that sufficed to find that the Manganos intended to obstruct a grand jury investigation.  A-3090-Tr.3851; *see also* A-586-87-Tr.38-39.  The Government's conflation of the two made it even more crucial that the obstruction jury charge convey *Aguilar*'s statutory line, and the failure to do so was error.

Because the jury was not properly instructed on *Aguilar*'s requirements, at minimum, the obstruction conviction should be vacated.  But in any event, the evidence of Mangano's intent was insufficient, requiring a judgment of acquittal.

## B.    The Evidence of Mangano's Intent Was Insufficient

In light of *Aguilar*, the Government had to prove beyond a reasonable doubt that Mangano "knew" that his actions were likely to obstruct a grand jury proceeding and that he specifically "intended" to obstruct a grand jury proceeding.  *Aguilar*, 515 U.S. at 599-601.  But the evidence presented at trial was legally insufficient to establish the requisite intent.  *See* AOB95-96.  No allegedly false statements were

made to the grand jury itself, and no evidence suggests that the Manganos knew that statements from Linda's interviews with FBI agents would be provided to the grand jury. Lacking any direct proof, the Government attempts to argue that circumstantial evidence proved Mangano's intent. This argument fails.

*First*, the Government repeatedly asserts that Linda's interviews were "pursuant to" the grand jury subpoena—an assertion with no basis in the record or the law. GAB134, 136. The interviews cannot have been "pursuant to" the subpoena because the subpoena "called for [Linda] to testify" before a grand jury, GAB134, and the interviews were plainly not testimony before a grand jury. Additionally, FBI agents, like those at the meetings with Linda, are not permitted to question witnesses or even attend grand jury testimony. *See United States v. Awadallah*, 349 F.3d 42, 66 n.18 (2d Cir. 2003) (Rule 6(d) "limits who may be present" to the prosecutors, the witness, interpreters, and a court reporter).

Nor were the interviews somehow tantamount to grand jury testimony. Had they been, then the interviews would have been governed by Federal Rule of Criminal Procedure 6(e), which, among other things, requires proceedings to have been "recorded by a court reporter or by a suitable recording device." Yet no proper recording was made of the interviews—a fact the Government exploited at trial in relying on the unreliable notes and testimony of an FBI agent to establish Linda's allegedly false statements. *See* L. Mangano Br.37-51. The Government cannot have

56

it both ways, treating the interviews as grand jury proceedings when convenient and as mere interviews when not.

The Government can point to nothing suggesting that the interviews were pursuant to the subpoena, not even testimony from an interviewing agent. Indeed, the record shows the opposite: FBI Agent Spence, who participated in the interviews, testified that Linda was not "required to be there" and was not "required to answer questions," A-1072-75-Tr.1237-51, which would not be true if the interviews had been pursuant to compulsory process such as a grand jury subpoena. Tellingly, Spence never testified that the grand jury was mentioned during any of the interviews or that anyone gave Linda "any indication that they would repeat [her] statements to the grand jury." *United States v. Schwarz*, 283 F.3d 76, 109 (2d Cir. 2002).

*Second*, the Government argues that the mere presence of FBI agents and prosecutors at Linda's interviews establishes the nexus. *See* GAB136. That argument is foreclosed by *Aguilar* and *Schwarz*. In *Aguilar*, the evidence was insufficient even though the defendant, a federal judge no less, asked the FBI agent if he was "a target of a grand jury investigation" and the agent responded that there was a grand jury and "some evidence will be heard I'm … sure on this issue." 515 U.S. at 600. In *Schwarz*, the evidence was insufficient even though the defendant had made the statements to the same "federal investigators and prosecutors that had served him with [the] federal grand jury subpoena." 283 F.3d at 109. Thus, the

57

mere presence of government agents—even ones connected in some fashion to an ongoing grand jury investigation—cannot establish the required intent.

*Third*, because the Government has no evidence establishing a nexus between Linda's interviews and the grand jury, it concocts a Kafkaesque theory based on the Manganos' production of documents about her employment by Singh. *See* GAB134-136.[5] "While those documents were not fraudulent," the Government says, the Manganos' "purpose in finding and producing them" was "to mislead." GAB135. That is farcical. The subpoena requested those documents. *See* A-1071-Tr.1234-35 (demanding, among other things, "any and all records … referring, relating or pertaining to … Singh" or "any and all entities related to" Singh). Had Linda *not produced* the required documents, the Government would have charged the failure to produce such documents as obstruction. The Government's guilty-if-you-do-guilty-if-you-don't theory should be rejected.

*Finally*, the other evidence recounted by the Government does not bear on the crucial issue of *Aguilar*'s nexus requirement. The Government argues that there was a grand jury proceeding ongoing, that the Manganos were aware of it, and that the

---

[5] This was not the Government's theory below, which focused exclusively on Linda's statements to federal agents. *See* A-2172-Tr.4049 (arguing in summation that the obstruction was "about getting the story straight so that when Linda Mangano comes into proffer with federal agents and prosecutors, she's not going to be telling the truth"); *see also* A-2173-Tr.4050-51 (same).

Manganos may even have believed there was a connection between the grand jury investigation and Linda's interviews with FBI agents and prosecutors. *See* GAB133-136. None of those points is legally sufficient evidence of Mangano's intent. Indeed, similar evidence (and more) was present in *Aguilar* and *Schwarz* but nevertheless insufficient to sustain those convictions.

The Government's attempts to distinguish *Aguilar* and *Schwarz* are meritless. *See* GAB137-38. *First*, the Government highlights that Aguilar did not lie "during an interview that was being conducted in response to a subpoena calling for testimony." GAB137. But this difference is not salient; instead, the line *Aguilar* draws is between testimony delivered "to the grand jury itself" and statements made to an investigator "who might or might not testify before a grand jury." 515 U.S. at 600-01. It is undisputed that Linda did not testify before the grand jury, and there is no record evidence that the Manganos knew that Linda's statements would reach the grand jury. *Second*, the Government notes that neither Aguilar nor Schwarz was served with a grand jury subpoena for testimony, an immaterial distinction given that Linda never testified. The Government characterizes her statements to prosecutors and agents as "in response to the subpoena," but as noted, that characterization is baseless. The Government cites no authority—nor could it—that a voluntary interview in a conference room with prosecutors and agents is a "response" to a grand jury subpoena calling for testimony. Regardless, what matters under *Aguilar* and

59

*Schwarz* is that the statements were not made to the grand jury or made knowing that they would be conveyed to the grand jury.

Under *Aguilar* and *Schwarz*, Mangano's obstruction conviction must be reversed for lack of sufficient evidence and a judgment of acquittal entered.

## IV. The Government's Misconduct in Rebuttal Requires Reversal

Both parties agree that when assessing whether a prosecutor's misconduct during summation caused substantial prejudice and thus requires reversal, a court must consider the misconduct in "context," or take "a contextual approach." AOB100 (quoting *United States v. Biasucci*, 786 F.2d 504, 514 (2d Cir. 1986)); GAB140 (quoting *United States v. Espinal*, 981 F.2d 664, 666 (2d Cir. 1992)). A court must consider three factors: "the severity of the misconduct; the measures adopted to cure the misconduct; and the certainty of conviction absent the improper statements." AOB100 (quoting *Biasucci*, 786 F.2d at 514); GAB140. But the Government misapplies those factors (and the cases interpreting them) to the facts of this case.

### A. All Three Factors Weigh in Favor of Reversal

Despite the Government's attempts to distinguish it, *United States v. Friedman*, 909 F.2d 705 (2d Cir. 1990), confirms that the prosecutor's comments here were severe. For example, the prosecution here told the jury:

> Now, I'm not attacking Mr. Keating [the defense attorney]. He has a
> job to do. He needs to think of arguments to make to you. That's what

he gets paid for.  His arguments have to focus on things other than the evidence.  Because if you focus on the evidence, his client loses.  *So I'm not surprised that Mr. Keating made this argument up or any of the other arguments that he made up during his [summation.]*

A-2331-Tr.4399 (emphasis added).  As in *Friedman*, those statements make "the grossly improper accusation that defense counsel 'will make any argument he can to get that guy off.'"  909 F.2d at 709.  And as in *Friedman*, the prosecution here highlighted that the defense counsel was "get[ting] paid … [to] ma[k]e this argument up."  A-2331-Tr.4399; *see Friedman*, 909 F.2d at 709 ("'[T]here are others who defend them, try to get them off, perhaps even for high fees.'").  In assessing severity, this Court held the statements in *Friedman* "grossly improper" because the prosecution is "not entitled to malign defense counsel by accusing him of willingness to make unfounded arguments."  *Id.*  That is exactly what the prosecution did here.

Importantly, in holding that the prosecutor's comments in summation required reversal, this Court in *Friedman* focused almost exclusively on a *single sentence* in the Government's rebuttal.  909 F.2d at 708-09.  This Court concluded that "the prosecutor managed *in one breath* to undermine the presumption of innocence, the Government's obligation to prove guilt beyond a reasonable doubt, and the standards of propriety applicable to public prosecutors."  *Id.* at 709 (emphasis added).  Based on the *one sentence*, this Court continued, "[t]he jury was invited to conclude that everyone the Government accuses is guilty, that justice is done only when a conviction is obtained, and that defense counsel are impairing this version of justice by

61

having the temerity to provide a defense and to try to 'get' the guilty 'off.'" *Id.* This reasoning refutes the Government's assertion that "an argument taking up less than a paragraph" cannot warrant reversal. GAB148.

Of course, *Friedman* noted a few other comments sprinkled throughout the rebuttal that made the prejudice clear. And so does Mangano. For instance, the Government referred to Mr. Keating as "extremely skillful" and called his argumentation "crafty." A-2331-Tr.4399; A-2326-Tr.4380; A-2343-Tr.4445. The Government now protests that those statements were "not … ad hominem attack[s]," but were, in fact, "[c]ompliment[s]." GAB147 & n.22. But the statements were far from complimentary. In context, the Government stated, "Mr. Keating he's an extremely skilled criminal defense attorney who had something to say about nearly everything. He talked to you for about six hours, and all he could come up with were these forms. Are you kidding me?" A-2326-27-Tr.4380-81.

As to "crafty," the Government told the jury that "Mr. Keating's suggestion" was "another one of those crafty but absurd arguments." A-2331-Tr.4399. The Government insists that crafty is "not an ad hominem attack" because "a common definition of 'crafty' is 'skillful, clever.'" GAB147 n.22. But the common understanding of the word crafty carries negative connotations, meaning "adept at deceiving others: cunning, wily," Webster's Third New International Dict. 528 (1966), and "clever, especially in a dishonest or secret way," Cambridge Dictionary,

62

https://dictionary.cambridge.org/us/dictionary/english/crafty. Context matters, and the Government used phrases like "crafty but absurd" to suggest that defense counsel was being deceitful or was trying to trick the jury, exacerbating the previous improper statements that Mangano's attorney was "paid" to "make up arguments."

Nor is *Friedman* the only precedent characterizing similar statements as severe. In summation, a prosecutor may not make "[s]tatements designed to appeal to the jury's emotions," such as "warn[ing] the jury not to 'be made fools of' or not to be 'made to appear fools.'" *United States v. Marrale*, 695 F.2d 658, 667 (2d Cir. 1982) (citing ABA Standard 3-5.8(c)). Nor may the Government frame the defense argument as "an insult to [the jury's] intelligence" or imply that it is "a concocted defense." *United States v. Gonzalez*, 488 F.2d 833, 836 (2d Cir. 1973). Finally, highlighting that Mangano hired and paid his counsel "strike[s] at the very fundamental due process protection[]" of the right to counsel and "severely damage[s] an accused's opportunity to present his case before the jury." *Bruno v. Rushen*, 721 F.2d 1193, 1194-95 (9th Cir. 1983) (citing *Powell v. Alabama*, 287 U.S. 45, 68-69 (1932)).

The Government's argument does not—and cannot—distinguish its comments here case from these precedents. Instead, the Government attempts to turn the table, pointing to Mangano's arguments purportedly "impugn[ing] the credibility of *the government's case*," "attack[ing] … integrity of *its case*," and questioning the

credibility of its witnesses, especially Singh. GAB144-45 (emphasis added). But none of these examples crosses over from challenging the prosecution's case to maligning the prosecutors themselves. As described above, the same cannot be said of the prosecution's summation. And because Mangano does not challenge the government's arguments that focus on the evidence, the cases that the Government cites permitting the prosecution to respond to defense arguments by "arguing that the defense [is] trying to distract the jury" are inapposite. GAB145.

The Government's response on the second and third factors is cursory at best. On the second factor—curative measures—the Government stated only that the trial court overruled Mangano because he only asked for a mistrial. GAB151. But that is an incorrect reading of the record. Initially, the district court overruled Mangano's objection to the Government's rebuttal before he asked for any specific curative measure and then took no curative measures at all. A-2331-Tr.4399. Later, Mangano asked for a mistrial based on the prosecution's improper comments, which the district court denied. A-2342-43-Tr.4444-48.

This again exactly parallels *Friedman*, except that in *Friedman*, the trial court *sustained* the objection and stated, "'I don't think that is appropriate.'" 909 F.2d at 708. This Court held that even *sustaining* the objection was not sufficient and did not rely on what (if any) specific relief was requested. Indeed, in "those cases where a prosecutor's improper remarks have not been deemed prejudicial, the record has

64

disclosed emphatic curative instructions by the trial judge." *Id.* at 710.

The Government addresses the "certainty of conviction" factor only in passing, concluding, without support or analysis, that "evidence of [Mangano's] guilt was strong" and that he "would have been convicted." GAB151-52. But there was a hung jury in the first trial, and this Court has held that "the best indication that the Government's case was not so overwhelming is the inability of the jury at [the] first trial to reach a verdict." *Friedman*, 909 F.2d at 710. The Government's conclusions—at odds with this Court's precedents—do nothing to show why the certainty of conviction factor would weigh in its favor. Indeed, it does not.

## B. The Government Impermissibly Shifted the Burden of Proof

During its rebuttal summation, the Government also improperly shifted the burden of proof to Mangano. That error, especially in conjunction with the other improper rebuttal conduct, requires reversal. Even the cases cited by the Government mandate this outcome.

The Government relies on *United States v. Walker*, 835 F.2d 983 (2d Cir. 1987), to show that prosecutors can refer to unasked questions. But far from buttressing the Government's argument, that case supports Mangano. In *Walker*, this Court held that it was "proper" for the prosecution to note "that evidence adduced by the government was not confronted on cross-examination," and that *if defense counsel speculated about the answer to an unasked question*, the Government could

point out that the defense could have asked that question but did not. *Walker*, 835 F.2d at 989. Yet this Court cautioned that the Government *could not* go beyond this narrow argument and suggest that the defense "could have 'ma[d]e a great case' … by asking certain questions and getting favorable answers." *Id.*

Here, by the Government's own admission, it pointed out Mangano's unasked questions to "undercut" the "alternative explanation that he advanced," GAB143, *i.e.*, to show he "could have 'ma[d]e a great case'" but did not. In doing so, the prosecution "improperly crossed the line into argument that may well have suggested to the jury that the defendant had some obligation to make a case of his own." *Walker*, 835 F.2d at 989. Although the Government may point out a lack of evidence, it "may not, however, go further and suggest that the defendant has the burden of producing evidence," as it did here. *United States v. Bautista*, 23 F.3d 726, 733 (2d Cir. 1994).

Additionally, in *Walker*, the "trial court's response to the objection to this precise part of the summation" was to offer a curative instruction that specifically referenced the "arguments about questions that were or were not asked" and that reiterated "that the defendant had no burden of proof" and "does not have to come forward with any evidence." *Walker*, 835 F.2d at 989; *see also United States v. Rivera*, 971 F.2d 876, 884 (2d Cir. 1992). This Court emphasized that "where the prosecution's commentary might reasonably have been interpreted by the jury as indicating

66

that the defendant had a burden to present a case of his own," "the court should sustain, not overrule, the defendant's objection, and it would be well advised to caution the government against making such arguments and to make a precautionary statement directly to the jury that the defendant has no such obligation." *Walker*, 835 F.2d at 989.

Here, the district court disregarded *Walker*'s directives. Instead, the court agreed with the defense at sidebar that the Government should have "frame[d] [its argument] with although the defendant has no burden," A-2343-Tr.4447, but took no curative action. That left the defense with only the general instruction in the jury charge, which was neither close in time nor specifically directed to the Government's prejudicial remarks. GAB151. Such a general instruction is not enough; a judge must give an immediate curative instruction. *See Biasucci*, 786 F.2d at 514 & n.10; *United States v. Modica*, 663 F.2d 1173, 1179-80 (2d Cir. 1981).

Because the prosecution's comments implying that Mangano had any sort of burden were improper, because the district court agreed that they were improper but failed to take any curative measures, and because the evidence against Mangano was thin (as evidenced by the hung jury in the first trial), these comments require reversal, particularly when viewed in combination with the improper *ad hominem* attacks.

## V. The District Court Abused Its Discretion in Denying Mangano's Rule 33 Motion

Singh's deposition testimony flatly contradicted his most important testimony

at trial. At his deposition, Singh said the alleged bribes to Mangano "had nothing to do with" the TOB matter—the only alleged bribery scheme of which Mangano was convicted. Yet the Government asserts that Singh's deposition testimony does not show that he committed perjury at trial, and that even if Singh did perjure himself, his perjured testimony was not material enough to require a new trial. Both assertions are belied by the record and controlling case law.

### A.  Singh Perjured Himself at Trial

Singh's deposition testimony cannot be reconciled with his trial testimony. At trial, Singh testified, "I hired Linda Mangano because I needed this loan guarantee [for the Woodlands and Tobay Beach] done from [TOB]," and "I bribed Ed Mangano and he, you know, did favors for me like getting me a loan guarantee from [TOB]." A-1145-Tr.1428-29; A-1157-58-Tr.1477-78. In stark contrast, at his deposition, Singh testified that the alleged bribes he paid to Mangano in fact "had nothing to do with the Town of Oyster Bay," since "Ed Mangano is not Town of Oyster Bay. He is Nassau County." A-2590.

The Government maintains that the deposition testimony was ambiguous and equivocal, and notes that Singh reaffirmed his trial testimony at the perjury hearing. GAB161-63. Neither explanation holds water.

*First*, there was nothing equivocal about Singh's deposition testimony relating to Mangano's involvement in the TOB matter. Singh plainly said that the "bribes to

[Mangano]" "had nothing to do with the Town of Oyster Bay." A-2590. It is difficult to imagine a clearer statement.

*Second*, the Government's reliance on Singh's convoluted and nonsensical explanations at the perjury hearing is misplaced. As discussed in the opening brief, Singh's explanation at the perjury hearing for why he denied bribing Mangano in relation to the Woodlands (SRB Convention) amendment was that he also bribed Mangano for the Tobay Beach (SRB Concession) amendment. AOB108. According to Singh, he denied bribing Mangano in relation to TOB loans because Singh interpreted the phrase "relate to SRB Convention" to mean "relate to *only* SRB Convention." A-2757. In response, the Government argues that Singh's answer to a "similar question" at the deposition supports Singh's specious explanation. GAB164. Singh was asked whether "the Town of Oyster Bay loan scheme" "had to do with S.R.B. Convention," to which Singh responded that it "had to do with two facilities, S.R.B. Convention and S.R.B. Concession." GAB164; A-2592.

But both the Government and the district court fail to explain how this colloquy supports Singh's explanation for denying bribing Mangano. GAB164; SPA-172-75. To the extent the Government suggests Singh's denial that he bribed Mangano is somehow undermined by this colloquy, the testimony was in response to a line of questioning about Venditto and is thus distinguishable. A-2591-92.

If anything, the colloquy underscores that Singh consciously denied bribing

69

Mangano in relation to the TOB matter. The Government's argument, at bottom, seems to be that Singh ascribed different meanings to the phrases "had to do with" and "relate to." But that argument fails because the questioner, at Singh's request, previously defined the phrase "relate to" as meaning "anything to do with," A-2589—a phrase that is indistinguishable from "had to do with." Indeed, when asked in a line of questioning about Venditto whether the TOB matter "had to do with" the Woodlands, Singh said it "had to do with" both the Woodlands and Tobay Beach. But when asked whether the bribes paid to Mangano "relate to" the Woodlands, Singh said they did not. The colloquy confirms that Singh was perfectly capable of correcting the questioner and responding that he bribed Mangano in relation to both the Woodlands and Tobay Beach—but he did not.

## B. The Perjury Was Highly Material to Mangano's Convictions

In an attempt to distinguish this Court's on-point precedent and show that the perjury was not material, the Government insists that "Singh was not the centerpiece to the government's case." GAB159-60, 166; *cf. United States v. Wallach*, 935 F.2d 445, 457 (2d Cir. 1991), *abrogated on other grounds by Ciminelli v. United States*, 143 S.Ct. 1121 (2023). But Singh was the Government's star witness, testifying for twelve days at the first trial and five days at the second trial. SPA-72-73. The entire case revolved around Singh, as reflected in the Government's opening and closing arguments. All the charged bribery schemes centered around Singh's contracts with

70

TOB and Nassau County, A-149, and Singh was a critical player in the alleged obstructive conduct, A-152.

Singh's deposition testimony also contradicted the most critical aspects of his trial testimony. The jury rejected the alleged Nassau County bribery schemes, convicting Mangano only in relation to the TOB matter. AOB117-18. Singh's testimony was crucial with respect to the TOB loans. As the alleged counterparty to the corrupt bargain, Singh provided the only testimony about his conversations with Mangano and the alleged *quid pro quo* agreement. Singh testified that Mangano asked Singh to hire his wife, and Singh agreed because Mangano "was working on getting the loan guarantee." A-1157-Tr.1476-77. In addition, Singh testified that he spoke with Mangano before the April 28, 2010, meeting at Venditto's headquarters to develop a plan and "make sure it's done." A-1160-Tr.1487-88. According to Singh's punchy synopsis at trial, "I bribed Ed Mangano and he, you know, did favors for me like getting me a loan guarantee from the Town of Oyster Bay." A-1145-Tr.1428-29.

After trial, Singh repudiated this central testimony on Mangano's supposed involvement in the TOB matter. Singh finally admitted, under oath, what he had told the Government in proffers from the start: Singh's alleged bribes to Mangano "had nothing to do with the Town of Oyster Bay." A-2590; *cf.* A-2892-2968 (proffer notes indicating that Singh did not mention Mangano's purported role in the TOB

matter in his first four proffer sessions); A-2970-71 (proffer in which Singh told Government, regarding the TOB matter, that "the result would have been the same" if Singh spoke to Venditto and did not involve Mangano); A-2977-78 (proffer in which Singh told prosecutors that he did not even discuss hiring Linda with Mangano until March or April of 2010).

The Government contends that Singh's complete about-face was not material because Mangano's guilt was "overwhelming." GAB166. But the procedural history alone dispels any notion that this was an open-and-shut case. Mangano's first trial ended in an acquittal for Venditto and a hung jury as to the Manganos.[6] A-136-46; Dkt. 297. At the second trial, the verdict was narrow—the jury rejected two of the three alleged bribery schemes, convicting Mangano only in relation to the TOB matter. A-29-51. This verdict demonstrates that the jury clearly had concerns about Singh's credibility—after all, Singh testified that Mangano accepted bribes for the alleged Nassau County schemes, which the jury rejected.

The circumstantial "evidence" the Government points to as supporting Mangano's convictions, GAB167-72, does not establish that there was no "'reasonable

---

[6]     Indeed, after the first trial, jurors reported that they "had already unanimously decided against convicting Edward Mangano" "based on the alleged Oyster Bay loan scheme." *See* Nicole Fuller, *Mangano Corruption Mistrial: What Went on in the Jury Room*, NEWSDAY (Jun. 3, 2018), https://www.newsday.com/long-island/nassau/mangano-trial-jury-p69540; *see also* Dkt. 339-3.

likelihood that the false testimony could have affected the judgment of the jury.'" *Wallach*, 935 F.2d at 456.[7]  Much of the evidence that the Government identifies is uncontested and irrelevant to the question of whether there was a *quid pro quo* agreement on the TOB matter.  For example, it was completely uncontested that:  Singh sought loans for capital improvements; Singh sought Mangano's help interfacing with TOB; Sinnreich and TOB officials had concerns about the constitutionality of the original proposal; and Mangano attended the April 28, 2010 meeting.  GAB167-70.  Other evidence that was contested, such as Linda's receipt of an alleged no-show job around the time Singh sought Mangano's help with the TOB matter, would have been severely undermined by Singh's deposition testimony.  If the jury had heard that the purported bribes "had nothing to do with" TOB, A-2590, the jury would likely have concluded that Singh gave Linda the job for another purpose.  Other gifts Mangano purportedly received, the allegedly free repairs to his house, and testimony about a building Mangano owned in TOB have nothing to do with the TOB matter and any alleged *quid pro quo*.  GAB171-74.

The Government also asserts that the TOB amendments "would never have

---

[7]     The Government seems to concede that this Court should apply the less stringent *Wallach* standard for when the prosecution knew or should have known about the perjury.  *See* GAB158-59 ("Thus, under the standard more favorable to him, Mangano must establish that a witness committed perjury at trial which reasonably affected the jury's judgment").

happened without Mangano's official action." GAB170. But the testimony that the Government cites regarding Mangano's involvement in the TOB matter goes only to the *quo* (*i.e.*, the official action). Singh's deposition testimony that any purported bribes had "nothing to do with" TOB completely undermined the *pro* (*i.e.*, the nexus between the purported *quid* and the *quo*).

In addition, Mangano could not have been convicted of obstruction without Singh's testimony about the allegedly obstructive nature of their meetings. A-1243-48-Tr.1696-1716. The Government argues that obstruction "was established, independent of Singh, through video evidence of Singh's visits to the Mangano home." GAB170. But without Singh's explanation of the substance of the meetings inside the house, A-1243-48-Tr.1696-1716, the videos would show only that Singh visited the Manganos' home, A-1243-Tr.1693-96—nothing more, nothing less.

Even if some of this circumstantial evidence corroborates Singh's perjured testimony, the fact that "there was evidence at trial independent of [perjured witness's] testimony tending to establish [defendant's] guilt" is not dispositive. *United States v. Walker*, 289 F. Supp. 3d 560, 567 (S.D.N.Y. 2018) (ordering new trial on basis of perjured testimony because of "the centrality of [the perjured testimony] to the Government's case"). Since Singh provided the only direct testimony about intent and the allegedly corrupt bargain regarding the TOB matter, his "testimony was essential to the government[]; indeed, he tied all the pieces together." *Wallach*, 935

74

F.2d at 458.

The Government further claims that Singh's deposition is merely cumulative impeachment evidence. GAB164-65. According to the Government, because Singh was impeached with lengthy cross-examination on "similar" statements, the deposition is "duplicative," "[a]t best," and does not warrant a new trial. GAB164-65, 167 n.24. But the impeachment evidence that was presented to the jury was of an entirely different character and import than Singh's contradictory deposition testimony, *under oath*, on what proved to be the most crucial topic at trial.[8] For example, at trial, on direct examination, the Government was able to temper the impact of the Mei body-wire recording where Singh told Mei that the Government "think[s] I have a contract [with TOB] because of Ed," but that Mangano did "[n]othing. Nothing." To rebut the recording, the Government elicited Singh's testimony that he lied to Mei in the recording because "it was no business of Fred Mei to know" about Singh's dealings with Mangano. A-1182-Tr.1575.

---

[8] The Government asserts that the distinction between contradictory statements made under oath and contradictory statements not made under oath is "groundless." GAB166-67 n.24. But the Federal Rules of Evidence recognize this very distinction because prior inconsistent statements made under oath are admissible as substantive evidence, whereas prior inconsistent statements not made under oath are inadmissible and may be used only for impeachment purposes. *See* Fed. R. Evid. 801(d)(1)(A); *see also Santos v. Murdock*, 243 F.3d 681, 684 (2d Cir. 2001) (explaining that prior inconsistent statements not made at a trial, hearing, proceeding, or deposition are "inadmissible hearsay for substantive purposes").

By contrast, it would have been much more difficult for Singh to explain away his statement at the deposition, under oath, that purported bribes to Mangano "had nothing to do with" the TOB matter. A-2590. The cases the Government cites in an attempt to show the deposition testimony was duplicative are thus inapposite. Indeed, in *Wallach*, this Court squarely stated that "[i]t was one thing for the jury to learn that [the witness] had a history of improprieties; it would have been an entirely different matter for them to learn that after having taken an oath to speak the truth he made a conscious decision to lie." 935 F.2d at 457; *see also United States v. Seijo*, 514 F.2d 1357, 1364 (2d Cir. 1975). Such testimony, "developed by skilled counsel [] could have induced a reasonable doubt in the minds of enough jurors to avoid a conviction." *Seijo*, 514 F.2d at 1364.[9]

While the Government is correct that the bar to obtain a new trial on the basis of newly discovered perjury is high, the fact that the Government's most important witness perjured himself on the most important issue at trial warrants reversal here.

---

[9] The Government's half-hearted suggestion, in a footnote, that Singh's deposition testimony is "newly available" evidence rather than "newly discovered" evidence because of similarities "to information the government disclosed pre-trial," GAB159 n.23, should be disregarded. *See Walker*, 289 F. Supp. 3d at 565 (holding that witness's testimony was newly discovered even though "the defense might have approached [the witness providing new testimony] before the trial"). Since Singh testified at the deposition *after* Mangano's trial, the deposition testimony "could not with due diligence have been discovered before or during trial." *Id.* (citing *United States v. Owen*, 500 F.3d 83, 87 (2d Cir. 2007)).

As in *Wallach*, Singh was the "centerpiece of the government's case." 935 F.2d at 457. But Singh's perjury is even more compelling than the perjury at issue in *Wallach* and *Seijo*, which went only to impeachment and collateral issues. "Critical portions" of Singh's perjured testimony "relate directly to the merits of the Government's case," and the contradictory deposition testimony goes to "'the heart' of the Government's case." *Walker*, 289 F. Supp. 3d at 567. As Singh testified at his deposition, the purported bribes paid to Mangano had "nothing to do with" TOB amendments and loans. Singh's testimony thus casts serious doubt on the existence of a *quid pro quo* on the TOB matter and very well could have affected the judgment of the jury.

## VI.    Mangano's Twelve-Year Sentence Was Procedurally and Substantively Unreasonable and the Restitution Order Should Be Reversed

### A.    Mangano's Sentence Was Procedurally Unreasonable

The district court procedurally erred by accepting the Government's argument that the NDH loans, which were not within the scope of any agreement between Mangano and Singh and not foreseeable to Mangano, should be attributed to Mangano for sentencing purposes.

The Government entirely ignores Mangano's argument that the district court did not conduct the appropriate analysis at sentencing regarding the foreseeability of the NDH loans. The law is clear that "the scope of conduct for which a defendant can be held accountable under the sentencing guidelines is significantly narrower

than the conduct embraced by the law of conspiracy." *United States v. Getto*, 729 F.3d 221, 234 n.11 (2d Cir. 2013). At sentencing, district courts are "required to make two particularized" findings on the scope of the agreement and foreseeability. *Id.* at 234. In contrast, a defendant could be found guilty of a broader conspiracy if he had "some knowledge of the unlawful aims of the conspiracy." *United States v. Perrone*, 936 F.2d 1403, 1416 (2d Cir. 1991). Yet, the district court largely referred to a prior order holding that the NDH amendments and loans were part of the scheme under the law of conspiracy for the purpose of analyzing the statute of limitations. SPA-136-47; SPA-211-13.

In addition, the Government fails to meaningfully respond to Mangano's argument that the NDH loans were not within the scope of the purported agreement between Singh and Mangano. AOB128-30. Most significantly, the Government completely ignores Singh's clear testimony that Mangano had "no involvement" in the NDH loans. A-1366-Tr.2041-42. Instead, the Government asserts that Mangano's conduct "led to" the NDH loans and that "[n]one of the four loans would have been made without Mangano." GAB196-97. But but-for causation is not the test. The Government instead needed to show that the NDH loans were within the scope of the agreement and were foreseeable.

On foreseeability, the Government largely glosses over the meaningful differences between the Madison and NDH amendments and loans, which are laid out in

detail in Mangano's opening brief. *See* AOB131-33. Those stark differences, including the fact that the NDH loans were unconstitutional and obtained in secret, demonstrate that the loans were not reasonably foreseeable to Mangano. AOB130-33. Instead, the Answering Brief focuses on the purported fact that Mangano understood he was to "take action in the future" on multiple "loans." GAB197-98. However, the evidence the Government cites undermines its position. In support of its foreseeability argument, the Government cites Singh's testimony that he told Mangano about needed improvements to the Woodlands and Tobay Beach. *Id.* But not once did Singh testify that he told Mangano multiple, later loans would be required. In fact, in the testimony the Government cites, Singh repeatedly refers to a singular "loan." *See* A-1160-Tr.1489 (the "whole purpose of this April 28th meeting was to find a way to get the [TOB to] guarantee this *loan* for my company") (emphasis added); *see also* A-1194-Tr.1624; A-1160-Tr.1486; A-1160-Tr.1488.

Even if Mangano "knew that millions of dollars of improvements had to be made" to Singh's concessions, as the district court held, SPA-138-39, the later NDH loans would not be foreseeable. First, the amount loaned by Madison was approximately $5 million and therefore millions of dollars in improvements could have been paid for by the Madison funds alone. SPA-59. In addition, Mangano's purported knowledge that capital improvements needed to be made is not enough under this Court's precedents to attribute the NDH loans to Mangano for sentencing purposes.

At most, Mangano was aware that Singh "contemplated the possibility" of capital improvements, which does not render foreseeable the need for multiple, later-in-time loans that were never discussed with Mangano. *Johnson*, 378 F.3d at 239.[10]

The district court's error in applying the 20-level enhancement was not harmless. Contrary to the Government's assertion, the district court did not "unequivocally state[] that it would impose the same sentence" without the NDH loans. GAB199. Instead, the district court merely stated that the Madison amendments and loans would "justify" Mangano's sentence. A-2877. Under this Court's precedent, that statement does not qualify as an "unambiguous declaration" that the district court would have imposed the same sentence. *See United States v. Feldman*, 647 F.3d 450, 459 (2d Cir. 2011).[11]

## B.    Mangano's Sentence Was Substantively Unreasonable

The Government's methodology for evaluating Mangano's disproportionate, 144-month sentence conceals the fact that hardly any similarly situated defendant

---

[10]    The Answering Brief does not identify any independent grounds for affirmance of the restitution order. GAB199 n.29. Mangano therefore refers the Court to the restitution section of his principal brief. AOB139-41.

[11]    The Government contends that the obstruction sentence was calculated appropriately under the Guidelines, but if this Court reverses the obstruction conviction (as it should, *see supra* at 52-60), or any other conviction, *de novo* sentencing on all counts will be required. *United States v. Rigas*, 583 F.3d 108, 115-18 (2d Cir. 2009) (holding that *de novo* sentencing is the default rule even when a conviction is reversed in part).

has received a longer sentence. *See* AOB136-39. The Government's data shows that only one New York public official who was convicted of federal charges received a sentence longer than Mangano's. *See* AOB153-54; A-356-61. Nationwide, the Government only identified a handful of officials who received longer sentences. *Id.* The Government's emphasis on the average sentencing point within the Guidelines range thus makes sense—it obscures the fact that Mangano's 144-month sentence is outrageously long compared to other public officials. As for the few defendants identified by the Government who received lengthy sentences, the Government's opposition disregards the fact that each of those defendants is entirely distinguishable from Mangano. AOB137-38.

The Government argues that Mangano's analysis "fails to account for the seriousness, breadth and role of his crimes compared to other defendants," GAB201, which is both wrong and hypocritical. The Government emphasizes that its analysis shows that other officials received an average sentence of 82% of the low-end of the applicable Guidelines range. GAB201-02. However, that analysis also does not account for the "seriousness, breadth and role" of the crimes of those defendants, because the 82% figure is simply an average. It erases any distinctions between those officials and lumps them together regardless of the circumstances of the crimes. In any event, as discussed above, Mangano's Guidelines were wrong.

Mangano's analysis better accounts for similarly situated defendants because

the comparison only includes defendants with the same primary Guidelines provision as Mangano, whose Guidelines range fell within Zone D on the sentencing table, and who fell within criminal history category I. AOB136-37. *Only 0.8%* of defendants meeting those criteria within the Second Circuit—and only 3% of defendants nationwide—received sentences of 120 months or above. *Id.* These "concern[s are] heightened by the procedural issues" explained above. *United States v. Singh*, 877 F.3d 107, 117 (2d Cir. 2017).

The Answering Brief fails to persuasively justify the improperly attributed NDH loans that resulted in an enormous 20-level enhancement. In addition, the Government's analysis of purportedly similarly situated defendants is flawed and conceals the fact that the district court unjustly sentenced Mangano—a 61-year-old man with an otherwise spotless criminal history convicted of a non-violent offense—to twelve years in prison.

82

## <u>CONCLUSION</u>

For the foregoing reasons, and the reasons set forth in Mangano's principal brief, the judgment of the district court should be reversed with instructions to enter a judgment of acquittal.  In the alternative, the judgment should be vacated and the case remanded for a new trial.  At minimum, Mangano's sentence should be vacated and the case remanded for resentencing.

Dated:  New York, New York
        July 14, 2023

Respectfully submitted,

WILSON SONSINI GOODRICH & ROSATI
Professional Corporation

<u>s/ Morris J. Fodeman</u>
Morris J. Fodeman
Jessica R. Lonergan
Alexander L. Luhring
1301 Avenue of the Americas, 40th Floor
New York, New York 10019
Telephone: 212-999-5800
Facsimile: 866.974.7329
Email: mfodeman@wsgr.com
Email: jlonergan@wsgr.com
Email: aluhring@wsgr.com

Fred A. Rowley, Jr.
633 West Fifth Street, Suite 1550
Los Angeles, California 90071
Telephone: 323-210-2900
Facsimile: 866.974.7329
Email: fred.rowley@wsgr.com

Paul N. Harold
Kelsey J. Curtis
1700 K Street NW, Fifth Floor
Washington, DC 20006
Telephone: 202-973-8800
Facsimile: 866.974.7329
Email: pharold@wsgr.com
Email: kcurtis@wsgr.com

*Attorneys for Defendant-Appellant*
*Edward Mangano*

## CERTIFICATE OF COMPLIANCE
## <u>WITH TYPE-VOLUME LIMITATION</u>

I hereby certify that:

1.  This reply brief complies with the requirements of Federal Rule of Appellate Procedure 32(a)(7)(B) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point font.

2.  This reply brief contains 19,980 words, exceeding the type-volume limitation of Second Circuit Rule 32.1(a)(4)(A), but within the Court's May 8, 2023 Order granting leave to file an oversized reply brief of up to 20,000 words.

Dated:  New York, New York
       July 14, 2023

Respectfully submitted,

*s/ Morris J. Fodeman*
Morris J. Fodeman

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on July 14, 2023, an electronic copy of this Reply Brief

for Defendant-Appellant Edward Mangano was filed with the Clerk of Court using

the ECF system.

Dated:  New York, New York
        July 14, 2023

Respectfully submitted,


*s/ Morris J. Fodeman*
Morris J. Fodeman
