

Wilson Sonsini Goodrich & Rosati
Professional Corporation

1301 Avenue of the Americas
40th Floor
New York, New York 10019-6022

O: 212.999.5800
F: 866.974.7329

**MORRIS J. FODEMAN**
Internet: mfodeman@wsgr.com
Direct dial: (646) 208-4387

November 14, 2023

Catherine O'Hagan Wolfe, Clerk of Court
Office of the Clerk
United States Court of Appeals for the Second Circuit
40 Foley Square
New York, New York 10007

**Re:** *United States v. Mangano* (No. 22-937 (CON)), Federal Rule of Appellate Procedure 28(j) submission of supplemental authority: *United States v. Schulte*, 2023 WL 5561141 (S.D.N.Y. August 29, 2023)

Dear Ms. O'Hagan Wolfe:

In *United States v. Schulte*, 2023 WL 5561141 (S.D.N.Y. August 29, 2023) (Furman, J.), the court granted the defendant's Rule 29 motion as to an obstruction charge under 18 U.S.C. § 1503. Relying on *United States v. Aguilar*, 515 U.S. 593 (1995), and *United States v. Schwarz*, 283 F.3d 76 (2d Cir. 2002), the court held that there was insufficient evidence of intent to obstruct a grand jury proceeding where the defendant merely made false statements to prosecutors and federal agents after receiving grand jury subpoenas.

Schulte was charged with lying to federal agents and prosecutors before and after being served with grand jury subpoenas compelling his testimony and allowing the seizure of his cell phone. *Id*. *2, 4. The court explained "that merely making false statements to law enforcement agents who might or might not later testify before a grand jury" was not obstruction of a grand jury proceeding. *Id*. *1. In *Aguilar*, "the defendant also knew of the grand jury proceedings and lied to the investigating agents," and in *Schwarz*, "the defendant made false statements to federal investigators and prosecutors two days after being served with a grand jury subpoena.'" *Id*. *5. Because both Aguilar and Schwarz had been acquitted, the court reasoned, these cases "compel[led]" Schulte's acquittal. *Id*. *7.

The same is true for Mangano. *See* Opening Br. 95-96; Reply Br. 55-60. As in *Schulte*, the linchpin of the government's theory is L. Mangano's receipt of a grand jury

WILSON SONSINI

Ms. Catherine O'Hagan Wolfe, Clerk of Court
November 14, 2023
Page 2

subpoena. *See* Gov't Br. 133-36. Indeed, the government argued that because L. Mangano received the subpoena before her allegedly false statements, this case differs from *Aguilar* and *Schwarz. See id*. 137-38. *Schulte* confirms that the government's reading is wrong. As in *Schulte*, "'[a]t best,'" "'the government proved that [L. Mangano], knowing of the existence of a federal grand jury investigation, lied to federal investigators regarding issues pertinent to the grand jury's investigation.'" *Schulte*, 2023 WL 5561141, at *7 (quoting *Schwarz*, 283 F.3d at 109). "Under *Aguilar*, that does not suffice." *Id*. Like Schulte, then, Mangano must be acquitted of the obstruction offense.

            Sincerely,

            *Morris Fodeman*

            WILSON SONSINI GOODRICH & ROSATI
            Professional Corporation


            Morris J. Fodeman

Enclosure

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
:
UNITED STATES OF AMERICA, :
:
-v- : 17-CR-548 (JMF)
:
JOSHUA ADAM SCHULTE, : OPINION AND ORDER
:
Defendant. :
:
------------------------------------------------------------------------X

JESSE M. FURMAN, United States District Judge:

Defendant Joshua Adam Schulte was convicted, following a month-long jury trial, of four counts of espionage in violation of 18 U.S.C. §§ 793(b) and (e), four counts of computer hacking in violation of 18 U.S.C. § 1030(a), and one count of obstructing justice in violation of 18 U.S.C. § 1503, in connection with, among other things, the leak of highly classified materials from the Central Intelligence Agency ("CIA") to WikiLeaks.org and a grand jury investigation that followed.[1] Schulte's trial — in which he represented himself — began on June 13, 2022, and concluded on July 13, 2022, when the jury returned a verdict of guilty on all counts. Thereafter, Schulte filed a motion, without the assistance of counsel, seeking a judgment of acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure or, in the alternative, a new trial pursuant to Rule 33 of the Federal Rules of Criminal Procedure. See ECF No. 992.

Except in one respect, Schulte's motions are without merit. First, the proof at trial was more than sufficient to sustain the jury's verdicts on the espionage and computer hacking counts. In arguing otherwise, Schulte ignores or mischaracterizes the trial evidence, asks the Court to draw

---

[1] Schulte was found guilty at a prior trial of one count of contempt of court in violation of 18 U.S.C. § 503 and one count of making false statements in violation of 18 U.S.C. § 1001. See ECF No. 581 (denying Schulte's Rule 29 motion as to those counts).

alternative inferences that the jury was not required to make, and argues that the Government was required to prove his crimes in particular ways with particular proof. Second, there is no merit to Schulte's contentions that he was denied a fair trial. In arguing otherwise, Schulte rehashes arguments about access to classified information that the Court previously considered with care and rejected, makes arguments that were never presented to the Court, or mischaracterizes the record. On these points, the Court feels no need to write more than to say that the motions are denied substantially for the reasons set forth in the Government's thorough memorandum of law in opposition to Schulte's motion. *See* ECF No. 1021 ("Gov't Opp'n").

Instead, the Court focuses here on the one aspect of Schulte's motion that has merit: his challenge to the jury's guilty verdict on Count Nine, which charged him with obstruction of justice in violation of Section 1503. The question presented is whether Schulte's conviction on Count Nine can be squared with *United States v. Aguilar*, 515 U.S. 593 (1995), in which the Supreme Court held that merely making false statements to law enforcement agents who might or might not later testify before a grand jury does not violate Section 1503. For the reasons that follow, the Court concludes that it cannot and thus grants Schulte's Rule 29 motion as to Count Nine.

## RELEVANT FACTS

Count Nine charged Schulte with obstruction of justice in violation of Section 1503. *See* ECF No. 405, at 7-8. Specifically, it stated as follows:

> From at least in or about March 2017, up to and including at least in or about June 2017, . . . JOSHUA ADAM SCHULTE, the defendant, did corruptly obstruct, influence, and impede, and endeavored to obstruct, influence, and impede the due administration of justice in a federal grand jury in the Southern District of New York by making false statements to special agents of the Federal Bureau of Investigation
> . . . .

*Id.* The Indictment then listed the false statements at issue: Schulte's denial of involvement in disclosing certain files, his statement that he had not kept an email containing false allegations of security issues at the CIA, his denial of having classified materials in his apartment, his denial of

2

taking information from the CIA and transferring it to an unclassified network, his denial of making a particular CIA computer network vulnerable to data theft, his denial of housing information from the CIA on his home computer, and his denial that he had ever removed confidential information from the CIA and taken it home. *Id.* at 8.

The evidence at trial relevant to Count Nine came primarily from FBI Special Agent Richard Evanchec. Agent Evanchec testified that he and another agent interviewed Schulte about the CIA leak on March 15, 2017. Tr. 201.[2] There was ample evidence at trial that Schulte lied during the interview, denying any involvement in the leak, but the particulars are not especially relevant here. At the end of the interview, the FBI served Schulte with two grand jury subpoenas, one of which "was for him to appear before a grand jury" on March 17, 2017, and the other of which "permitted the FBI to seize his cellular phone." Tr. 210, 310. The agents seized Schulte's cellphone "[p]ursuant to the subpoena," Tr. 310, and then proceeded with Schulte to his apartment, where agents were prepared to execute a search warrant, Tr. 212. There, the FBI Agents asked Schulte about the contents of the apartment, including whether he had a printed copy of a particular classified email from the CIA. Tr. 212, 223. Schulte denied that he had a copy of the email (or any emails that he had printed from the CIA) and denied that he had any classified information. Tr. 212-13, 223. In the search that followed, however, the Agents found printed copies of classified emails from the CIA, including the specific email Schulte denied having, in the headboard of his bed. Tr. 213, 223-24; *see also* GX 1616-17, 1642, 3003.

Agent Evanchec interviewed Schulte again on March 20 and 21, 2017. Tr. 231-35. These interviews, which took place at the U.S. Attorney's Office in Manhattan, were attended also by another FBI Special Agent, two attorneys that Schulte "brought with him," and two Assistant

---

[2] "Tr." refers to the transcript of trial and "GX" refers to a Government Exhibit.

3

United States Attorneys. Tr. 231. During these interviews, Schulte was asked "a litany of questions that basically asked every which way to Sunday if [he] had any involvement in the WikiLeaks releases." Tr. 234. Schulte denied any involvement. Tr. 235. The same group reconvened one more time, also at the U.S. Attorney's Office, in June 2017. Tr. 235-37. According to Agent Evanchec, "[t]he principal topic of that interview was essentially to go through the evidence that [the agents] had recovered primarily from [Schulte's] apartment and to get an understanding of what that evidence was, and he went piece by piece and explained what it was and who had access to it." Tr. 236. There is no evidence in the record that any mention was made at any of these interviews about a grand jury or the grand jury subpoenas that Schulte was served on March 15, 2017. Indeed, the only mention of the grand jury at all were two brief mentions — one during Agent Evanchec's direct examination and one during his cross-examination — of the subpoenas. Tr. 210, 310. The subpoenas themselves were not admitted into evidence. Tr. 2399-400.

## STANDARD OF REVIEW

Rule 29(a) of the Federal Rules of Criminal Procedure requires the court to "enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." A defendant challenging the sufficiency of the evidence under Rule 29(a), however, "bears a heavy burden, as the standard of review is exceedingly deferential to the jury's verdict." *United States v. Gu*, 8 F.4th 82, 86 (2d Cir. 2021) (cleaned up). Specifically, a court "must view the evidence in the light most favorable to the government, crediting every inference that could have been drawn in the government's favor, and deferring to the jury's assessment of witness credibility and its assessment of the weight of the evidence," *United States v. Chavez,* 549 F.3d 119, 124 (2d Cir. 2008) (cleaned up), and it must affirm the conviction if "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt," *Jackson v. Virginia,* 443 U.S. 307, 319 (1979); *see also United States v. Guadagna,* 183 F.3d 122, 130 (2d Cir. 1999) (stating that a court may

4

overturn a jury's verdict only if the evidence supporting the verdict is "nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt" (internal quotation marks omitted)). A reviewing court must review the evidence "in its totality, not in isolation." *United States v. Anderson*, 747 F.3d 51, 60 (2d Cir. 2014).

Significantly, the Government "need not negate every theory of innocence" and "may prove its case entirely by circumstantial evidence so long as guilt is established beyond a reasonable doubt." *United States v. Glenn*, 312 F.3d 58, 63-64 (2d Cir. 2002). Indeed, "[t]he law . . . recognizes that the *mens rea* elements of knowledge and intent can often be proved through circumstantial evidence and the reasonable inferences drawn therefrom." *United States v. MacPherson*, 424 F.3d 183, 189 (2d Cir. 2005) (citing cases). "Where the Government asks the jury to find an element of the crime through inference," however, "the jury may not be permitted to conjecture or to conclude upon pure speculation or from passion, prejudice or sympathy." *United States v. Vernace*, 811 F.3d 609, 615 (2d Cir. 2016) (cleaned up). Instead, those inferences must be "sufficiently supported to permit a rational juror to find that the element, like all elements, is established beyond a reasonable doubt." *United States v. Pauling*, 924 F.3d 649, 657 (2d Cir. 2019) (internal quotation marks omitted). "If the evidence viewed in the light most favorable to the prosecution gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence, then a reasonable jury must necessarily entertain a reasonable doubt." *United States v. Valle*, 807 F.3d 508, 515 (2d Cir. 2015) (internal quotation marks omitted).

## DISCUSSION

Count Nine charged Schulte with obstruction of justice in violation of Section 1503. As relevant here, that statute makes it a crime to "corruptly . . . influence[], obstruct[], or impede[], or endeavor[] to influence, obstruct, or impede, the due administration of justice." 18 U.S.C. § 1503(a). In *Aguilar*, however, the Supreme Court placed "metes and bounds" on this "very broad

5

language." 515 U.S. at 599. In particular, "[t]he action taken by the accused must be with an intent to influence judicial or grand jury proceedings; it is not enough that there be an intent to influence some ancillary proceeding, such as an investigation independent of the court's or grand jury's authority." *Id.* Put differently, "the government must show a 'nexus' between the defendant's act and the judicial proceedings; that is, there must be 'a relationship in time, causation, or logic' such that the act has 'the natural and probable effect of interfering with the due administration of justice.'" *United States v. Desposito*, 704 F.3d 221, 230 (2d Cir. 2013) (quoting *Aguilar*, 515 U.S. at 599-600). "[I]f the defendant lacks knowledge that his actions are likely to affect the judicial proceeding, he lacks the requisite intent to obstruct." *Aguilar*, 515 U.S. at 599; *see United States v. Schwarz*, 283 F.3d 76, 107-09 (2d Cir. 2002) (interpreting and applying *Aguilar*); *see also United States v. Triumph Cap. Grp., Inc.*, 544 F.3d 149, 169-70 (2d Cir. 2008) ("*Aguilar* makes clear that [18 U.S.C.] § 1503 is not violated if the defendant merely has the *impression* that his conduct will have the natural and probable effect of obstructing justice.").

The facts and holding of *Aguilar* itself are especially instructive here. The case involved Robert Aguilar, a federal district court judge who disclosed the existence of a wiretap investigation to one of its targets. *See Aguilar*, 515 U.S. at 596. Shortly thereafter, a grand jury began to investigate related matters, and two FBI agents questioned Aguilar. *See id.* at 596-57. During the interview, which was recorded, Aguilar "lied about his participation in the [underlying] case and his knowledge of the wiretap." *Id.* at 597. More relevant here, Aguilar asked the agents whether he was "a target of a grand jury investigation." *Id.* at 600. The agent responded by stating that there was a grand jury "[c]onvening" and he was "sure" that "some evidence" would "be heard . . . on this issue." *Id.* Aguilar himself testified "that, at least at the conclusion of the interview, it was his 'impression' that his statements to the FBI agents would be reported to the grand jury." *Id.* at 614 (Scalia, J., concurring in part and dissenting in part). The Government argued that these facts were

6

sufficient to support conviction under Section 1503. "Because [Aguilar] knew of the pending [grand jury] proceeding," the Government contended, his "statements [were] analogous to those made directly to the grand jury itself, in the form of false testimony or false documents." *Id.* at 601.

The Court rejected this argument. The Court held that Aguilar's exchange with the agent about the grand jury did "not enable a rational trier of fact to conclude that [he] knew that his false statement would be provided to the grand jury, and that the evidence goes no further than showing that [Aguilar] testified falsely to an investigating agent." *Id.* "The Government," the Court reasoned, "did not show here that the agents acted as an arm of the grand jury, or indeed that the grand jury had even summoned the testimony of these particular agents." *Id.* at 600; *see id.* at 602 (observing that a jury could convict a defendant who, "with the requisite intent," lied "to a subpoenaed witness," even if that witness was "ultimately not called to testify" or testified but did not "transmit the defendant's version of the story"). "Such conduct," the Court continued, "falls on the other side of the statutory line from that of one who delivers false documents or testimony to the grand jury itself. Conduct of the latter sort all but assures that the grand jury will consider the material in its deliberations. But what use will be made of false testimony given to an investigating agent who has not been subpoenaed or otherwise directed to appear before the grand jury is far more speculative." *Id.* at 601. In short, "uttering false statements to an investigating agent — and that seems to be all that was proved here — who might or might not testify before a grand jury is [in]sufficient to make out a violation of the catchall provision of § 1503." *Id.* at 600.

In light of *Aguilar*, Schulte's conviction on Count Nine cannot stand. Indeed, there is "no meaningful distinction between this case and *Aguilar*." *Schwarz*, 283 F.3d at 109. Here, as there, "the evidence goes no further than showing that [the defendant] testified falsely to an investigating agent" who "might or might not testify before a grand jury." *Aguilar*, 515 U.S. at 600-01. In fact, if anything, the evidence of a "nexus" to a grand jury investigation in *Aguilar* was much stronger

7

than it is here. The defendant in *Aguilar* was a federal district court judge who, it could be inferred, understood what a grand jury investigation involved. *See also Schwarz*, 283 F.3d at 109 (reversing a Section 1503 conspiracy conviction of police officers in light of *Aguilar* despite the Government's argument that they, "as experienced police officers[,] could have anticipated that a case such as this would result in a federal grand jury proceeding"). Here, there is no evidence that Schulte understood the workings of a grand jury. The defendant in *Aguilar* affirmatively asked if there was a grand jury investigating and was told that there was and that it was likely the grand jury would hear "some evidence" on the issues he had discussed with the agents. Moreover, he admitted that, at least at the conclusion of the interview, "it was his 'impression' that his statements to the FBI agents would be reported to the grand jury." Here, the only evidence regarding Schulte's knowledge that there was a grand jury proceeding came from the fact that, at the conclusion of the March 15, 2017 interview, he was served with two grand jury subpoenas, one of which called for his testimony two days later and one of which allowed the agents to seize his cellphone. *See Schwarz*, 283 F.3d at 107 (finding the evidence insufficient to establish a "nexus" where the defendant "was served with a grand jury document subpoena . . . two days before he made allegedly false statements to federal investigators and prosecutors"). Notably, there is no evidence whatsoever that he knew of the grand jury *prior* to being served with the subpoenas, when he first made false statements to Agent Evanchec. And while he was interviewed and made additional false statements later — on March 20 and 21, 2017, and in June 2017 — the record contains no actual evidence that the grand jury proceedings were ongoing on those dates, let alone that Schulte knew that they were ongoing. (The date for his testimony before the grand jury had come and gone.)

The Government's defense of Schulte's conviction on Count Nine is as brief as it is unpersuasive. The Government devotes a single paragraph of its eighty-one-page opposition to the question of whether there was nexus between Schulte's false statements to Agent Evanchec and the

8

grand jury proceedings. It asserts that "the jury could reasonably conclude that Schulte both knew the grand jury proceeding was pending when he lied to the FBI and was aware that his statements to the FBI were likely to affect or influence the grand jury proceedings. Indeed, one clear inference from the evidence is that Schulte hoped his false statements would deflect suspicion away from himself, focus the investigation on unproductive avenues chasing incorrect theories of how the offense was committed, and avoid being called to provide testimony directly to the grand jury." Gov't Opp'n 70. In support of this assertion, it cites three facts: "that the two grand jury subpoenas were served on Schulte by FBI agents, and Schulte lied to these same FBI agents; that the grand jury subpoenas required Schulte's telephone to be presented to the grand jury and required his testimony on March 17, 2016; and that Schulte lied to the FBI after having received the subpoena on March 14, 20, and 21, 2016." *Id.* But the Government makes no effort to explain how these facts distinguish this case from *Aguilar*, in which the defendant also knew of the grand jury proceedings and lied to the investigating agents — presumably also in the "hope[]" that "his false statements would deflect suspicion away from himself, focus the investigation on unproductive avenues chasing incorrect theories of how the offense was committed, and avoid being called to provide testimony directly to the grand jury." *Id.* Nor does it distinguish *Schwarz*, in which the defendant made false statements to federal investigators and prosecutors two days after being served with a grand jury subpoena, presumably in the "hope[] that they would be provided to the grand jury." 283 F.3d at 109. Remarkably, the Government does not even cite *Aguilar* or *Schwarz* — despite the fact that the Supreme Court's decision was the primary focus of oral argument on Schulte's Rule 29 motion at the conclusion of the evidence and the Court expressed "serious doubts" about whether the evidence was sufficient to support a conviction in light of *Aguilar*. *See* Tr. 2043-54; *see also* ECF No. 874 (ordering the parties to "be prepared to address" at oral argument whether the evidence as to Count Nine was sufficient in light of *Aguilar*).

9

The cases the Government does cite — *United States v. Sutherland*, 921 F.3d 421 (4th Cir. 2019), and *United States v. Reich*, 479 F.3d 179 (2d Cir. 2007) (Sotomayor, J.) — do not permit the Court to ignore binding Supreme Court precedent. They are also easily distinguished. In *Reich*, the defendant had forged a court order enjoining ongoing arbitration proceedings, mooting a pending mandamus petition, and recusing the presiding magistrate judge. *See* 479 F.3d at 182. He was convicted of violating 18 U.S.C. § 1512(c)(2) — "whose relevant language is substantially similar to the relevant language in" Section 1503 — and he appealed, relying on *Aguilar* to argue that there was an insufficient nexus between his conduct, sending a forged order to opposing counsel, and the judicial proceedings in which he was a participant. 479 F.3d at 185-86. The Court rejected that argument on the ground that the defendant had "directly injected a false order into ongoing litigation to which he was a party," to "'natural and probable'" effect. *Id.* at 186. "Because the forged Order appeared to render moot [the pending] application to the Second Circuit for a writ of mandamus," the Court explained, "it was foreseeable that upon receiving the forged Order, [opposing counsel] would withdraw the application, as he in fact did. In addition, because the forged Order expressly invited the parties to contact [the presiding district judge] regarding further proceedings, it was foreseeable that [opposing counsel] would contact [the presiding district judge], as he in fact did." *Id.* at 186. Notably, the Court stressed that the relationship between the defendant's conduct and the proceedings was "much closer than [that] found insufficient in *Aguilar* or *Schwarz*, where the defendants merely made false statements to agents who might or might not later testify before a grand jury." *Id.* Schulte too "merely made false statements to agents who might or might not later testify before a grand jury." *Id.*

In *Sutherland*, the defendant was served with grand jury subpoenas seeking financial records from his companies, which had engaged in dodgy efforts to avoid paying taxes. *See* 921 F.3d at 423-24. Shortly thereafter, his attorney sent to the U.S. Attorney's Office "a letter that purported to

10

explain away a large number of transactions relating to the subpoenaed materials" and attached loan documents that turned out to be fabricated. *Id.* at 424. As in *Reich*, the defendant was charged and convicted of violating Section 1512(c)(2) and challenged that conviction on appeal based on *Aguilar*. *See* 921 F.3d 421 at 425. The Fourth Circuit affirmed. "The official proceeding Sutherland attempted to influence," the Court reasoned, "was not some far-off possibility. The grand jury had in fact convened." *Id.* at 428. Moreover, the defendant's "actions . . . show[ed] a clear relationship in time, causation or logic with the grand jury proceedings. Indeed, . . . [t]he temporal and logical relationships are clear: Sutherland distributed the false loan documents just months after the grand jury subpoena was served upon him, and those documents attempted to explain away transactions reflected in the subpoenaed documents." *Id.* (internal quotation marks omitted). Notably, the Fourth Circuit concluded that the case was indistinguishable from *Reich*, "where forwarding the fake or forged document had the foreseeable consequence of reaching and influencing an ongoing court proceeding." *Id.* at 428. "As in *Reich*," the Fourth Circuit concluded, "a rational jury could find that Sutherland's giving false evidence to the U.S. Attorney's office in charge of presenting evidence to the grand jury in fact had one intended and foreseeable consequence: transmission of those documents to the grand jury." *Id.* at 428-29.

To the extent that the Fourth Circuit's decision rests on the fact that the defendant had submitted false documents to the U.S. Attorney's Office, and the reasonable inference from that fact that he intended for the documents to be submitted, in turn, to the grand jury that had subpoenaed his companies, it is both sound and easily distinguished from *Aguilar* and this case. As the Second Circuit has observed, there is "a key difference between the issuance of a grand jury subpoena *duces tecum* seeking the production of documents and the questioning of a subject by an investigating agent." *Triumph Cap. Grp.*, 544 F.3d at 168. The former "are often drawn broadly, sweeping up both documents that may prove decisive and documents that turn out not to be," to ensure that no

11

"relevant document will escape the grand jury's notice." *Id*. It thus follows that "[d]estruction of a relevant document" (as in *Triumph Capital Group*) or fabrication of relevant documents (as in *Sutherland*) is "likely to impact the grand jury's deliberations. *Cf. Aguilar*, 515 U.S. at 601 ('delivery of false documents' to the grand jury would be obstruction of justice)." *Id*. "By contrast, an investigating agent collecting statements from witnesses (or even, as in *Aguilar*, from a suspect) does not always act as 'an arm of the grand jury,' and 'what use will be made of false testimony given to an investigating agent who has not been subpoenaed or otherwise directed to appear before the grand jury is . . . speculative.'" *Id.* at 169 (quoting *Aguilar*, 515 U.S. at 600-01).

Admittedly, however, there is other language in *Sutherland*, resting on the supposed distinction between prosecutors and agents, that could arguably support Schulte's conviction on Count Nine. Specifically, the Fourth Circuit distinguished *Aguilar* in part on the ground that there are "meaningful differences" between making false statements to prosecutors and agents. 921 F.3d at 428. "A prosecutor tasked with presenting to the grand jury," the Court reasoned, "is more akin to a witness who has been subpoenaed than one who has not. As with a subpoenaed witness, there is a strong likelihood that the U.S. Attorney's office would serve as a channel or conduit to the grand jury for the false evidence or testimony presented to it. '[A]ttorneys for the government,' after all, may be present while the grand jury is in session. Fed. R. Crim. P. 6(d)(1)." *Id*. If applied here, that reasoning would arguably support the jury's verdict on Count Nine because Schulte's false statements on March 20 and 21, 2017, and in June 2017 were made not only to Agent Evanchec but also to Assistant United States Attorneys.

The Court departs from this strain of *Sutherland* for several reasons. First, the Government conspicuously does not rely on *Sutherland* to argue that Schulte's conviction survives because he made false statements to federal prosecutors as well as agents and, thus, has forfeited any such argument. Second, any such argument would be foreclosed by the Second Circuit's decision in

12

*Schwarz* (which, unlike *Sutherland*, is obviously binding on this Court). Like Schulte, the defendant in *Schwarz* made false statements to "federal investigators *and prosecutors*" just days after being served with a federal grand jury subpoena. 283 F.3d at 107 (emphasis added). Even so, the Second Circuit reversed, concluding that there was "no meaningful distinction between this case and *Aguilar*" and giving no hint that the involvement of federal prosecutors was relevant to the analysis. *Id*. at 109. Third, to the extent that *Sutherland* stands for the proposition that *Aguilar* can be distinguished where, as here, a defendant makes false statements to federal prosecutors, it is unpersuasive. The fact that "attorneys for the government" are entitled, under the Federal Rules of Criminal Procedure, to be present while the grand jury is in session does not make it any more likely that such a defendant's false statements will be repeated to the grand jury. Among other things, Assistant United States Attorneys do not usually provide evidence to a grand jury themselves; evidence is presented through the testimony of witnesses, such as agents. Finally, and in any event, there is, as noted above, no evidence in the record here that the grand jury proceedings were ongoing when Schulte attended the interviews at the U.S. Attorney's Office. Nor is there any evidence to suggest that the Assistant United States Attorneys who attended Schulte's interviews were "tasked with presenting to the grand jury." *Sutherland*, 921 F.3d at 428.[3]

---

[3] *Reich* and *Sutherland* are the only cases cited by the Government in its opposition to Schulte's written motion. During oral argument on Schulte's oral motion, however, the Government relied also on the Second Circuit's decision in *Desposito*. Tr. 2048. The Court construes that to mean that the Government has abandoned any argument that this case is akin to *Desposito*. In any event, it too is easily distinguished. There, the defendant wrote letters to associates in furtherance of a plan "to create fraudulent evidence . . . that would be admitted into evidence to raise a reasonable doubt as to his guilt." 704 F.3d at 231. For example, in one letter, "Desposito explained that he wanted to plant the fake lighter fluid can 'so later on in my trial we can enter [it] into evidence and show the can that was found ain't the one I bought.'" *Id*. In another letter, he wrote that "[i]f you follow my instructions to a T, you'll raise enough reasonable doubt to save my life." *Id*. On their face, therefore, "the letters clearly demonstrate[d] Desposito's intent that the fabricated evidence would influence his criminal trial." *Id*. There is no such evidence here.

13

In short, the Supreme Court's decision in *Aguilar* compels the Court to conclude that the evidence is insufficient to support Schulte's conviction on Count Nine for obstruction of justice in violation of Section 1503. Schulte "had not himself been called to testify and there is no evidence that the investigators gave him any indication that they would repeat his statements to the grand jury." *Schwarz*, 283 F.3d 109. "At best," therefore, "the government proved that [Schulte], knowing of the existence of a federal grand jury investigation, lied to federal investigators regarding issues pertinent to the grand jury's investigation." *Id*. Under *Aguilar*, that does not suffice. Importantly, that conclusion does not, as the Government argued orally at trial, "present fairly staggering consequences for criminal investigations." Tr. 2049. After all, knowingly making false statements to a federal law enforcement agent without the intent to obstruct a grand jury violates other federal statutes, such as 18 U.S.C. § 1001 (for which, in fact, Schulte was convicted based on his false statements to Agent Evanchec); it just does not violate Section 1503. *See Schwarz*, 283 F.3d at 106 (observing that the evidence would have "no doubt" been sufficient to support a conviction for conspiracy to violate Section 1001).

## CONCLUSION

For the foregoing reasons, the Court concludes that the jury's verdict on Count Nine cannot stand and, thus, GRANTS Schulte's Rule 29 motion for a judgment of acquittal on that Count. Schulte's Rule 29 and 33 motions are otherwise DENIED.

The Clerk of Court is directed to terminate ECF No. 992.

SO ORDERED.

Dated: August 29, 2023
New York, New York

_____
JESSE M. FURMAN
United States District Judge

14